# UNITED STATES DISTRICT COURT
## DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| CITY OF CHELSEA, Individually and on behalf of all others similarly situated,<br><br>          Plaintiff,<br><br>    v.<br><br>FIRE APPARATUS MANUFACTURERS' ASSOCIATION;<br>OSHKOSH CORPORATION;<br>PIERCE MANUFACTURING, INC.;<br>REV GROUP, INC.;<br>E-ONE, INC.;<br>FERRARA FIRE APPARATUS, INC.;<br>KOVATCH MOBILE EQUIPMENT CORP.;<br>SPARTAN FIRE, LLC;<br>SMEAL SFA, LLC;<br>SMEAL LTC, LLC;<br>ROSENBAUER AMERICA, LLC;<br>ROSENBAUER SOUTH DAKOTA, LLC;<br>ROSENBAUER MINNESOTA, LLC,<br><br>          Defendants. | Case No.<br><br>CLASS ACTION COMPLAINT<br><br>DEMAND FOR JURY TRIAL |

**TABLE OF CONTENTS**

I. NATURE OF THE CASE ...................................................................................................1

II. THE PARTIES ...................................................................................................................3

    A. Plaintiff ..................................................................................................................3

    B. Defendants ..............................................................................................................3

        1. Oshkosh Defendants ..................................................................................3

        2. REV Group Defendants .............................................................................4

        3. Rosenbauer America LLC ..........................................................................6

        4. Fire Apparatus Manufacturers' Association ..............................................7

        5. Co-Conspirators and Agents .....................................................................7

III. JURISDICTION AND VENUE ..........................................................................................8

IV. FACTUAL ALLEGATIONS ..............................................................................................9

    A. Background...............................................................................................................9

        1. Categories and Types of Fire Apparatus....................................................9

        2. The Fire Apparatus Industry ...................................................................13

    B. Defendants Engaged in an Aggressive Acquisition Strategy to Gain Monopoly Power in the Fire Apparatus Industry .............................................................................14

        1. AIP and REV Group .................................................................................14

        2. Oshkosh and Pierce .................................................................................18

        3. Rosenbauer ...............................................................................................21

    C. Manufacturer Defendants Cooperate with One Another to Avoid Competing............22

    D. Manufacturer Defendants Exchange Confidential and Proprietary Information Through FAMA ...............................................................................................................24

        1. FAMA Statistical and Survey Reports......................................................25

        2. FAMA Bi-Annual Meetings Presented Manufacturer Defendants with the Opportunity to Further Exchange and Discuss Competitively Sensitive Information ...............................................................................................30

    E. Manufacturer Defendants Submit Uniform Pricing to Governmental Cooperative Purchasing Consortiums, Undercutting Competitive Bidding .....................................31

    F. Manufacturer Defendants Restrict Manufacturing Capacity Despite a Huge Backlog 32

        1. Backlogs in Fire Apparatus Orders Increased by 40%......................................32

2.   Manufacturer Defendants Restrict Manufacturing Capacity...............................37

G.  Defendants' Conspiracy Caused Significant Price Hikes and a Dangerous Supply Shortage of Fire Apparatus ...................................................................................42

1.   The Price of Fire Apparatus Doubled During the Class Period..........................42

2.   Manufacturer Defendants Implemented "Floating Prices" to Further Increase Prices .................................................................................................................43

3.   Manufacturer Defendants Reaped Substantial Profits as a Result of the Conspiracy ........................................................................................................44

V.     ANTICOMPETITIVE EFFECTS .........................................................................................47

A.  Plaintiffs Paid Artificially Inflated Prices for Fire Apparatus .....................................47

B.  Plaintiff and Class Members Cannot Access Essential Fire Apparatus, Jeopardizing Public Safety.................................................................................................................48

C.  Plaintiff and Class Members Have Diverted Funds from Other Essential Needs to Pay the Artificially Inflated Prices of Fire Apparatus.........................................................51

VI.    ANTITRUST INJURY & DAMAGES ..................................................................................51

VII.   CLASS ACTION ALLEGATIONS.......................................................................................52

VIII. RELEVANT MARKET .........................................................................................................54

A.  Relevant Product and Geographic Market....................................................................54

B.  Manufacturer Defendants Share Market Power in the Relevant Market.......................55

1.   High Market Concentration ...............................................................................55

2.   High Barriers to Entry ......................................................................................56

3.   Demand for Fire Apparatus is Inelastic ............................................................57

IX.    FRAUDULENT CONCEALMENT AND TOLLING............................................................58

X.     CONTINUING VIOLATIONS .............................................................................................60

XI.    CAUSES OF ACTION..........................................................................................................61

XII.   PRAYER FOR RELIEF ........................................................................................................64

ii

Plaintiff, the City of Chelsea, brings this class action on behalf of itself and a proposed class of direct purchasers of fire apparatus (the "Class") against Defendants Oshkosh Corporation, Pierce Manufacturing, Inc., REV Group, Inc., E-One, Inc., Ferrara Fire Apparatus, Inc., Kovatch Mobile Equipment, Corp., Spartan Fire, LLC, Smeal SFA, LLC, Smeal LTC, LLC, Rosenbauer America, LLC; Rosenbauer South Dakota, LLC, Rosenbauer Minnesota, LLC (together "Manufacturer Defendants"), and the Fire Apparatus Manufacturers' Association ("FAMA") (together Defendants) for violations of Section 1 of the Sherman Act and Section 7 of the Clayton Act.

## I.    NATURE OF THE CASE

1.      This action arises from a years-long conspiracy by the nation's dominant fire apparatus manufacturers to fix prices, suppress competition, and restrict the supply of critically needed firefighting apparatus. Fire apparatus—pumpers, aerials, rescues, tankers, wildland units, and Aircraft Rescue and Firefighting ("ARFF") vehicles—are life-saving tools that local municipalities and other governmental entities rely upon to protect the public. When these entities cannot secure the necessary apparatus to perform their public safety duties, firefighters and civilians face unacceptable risks.

2.      Beginning no later than January 1, 2016, Defendants engaged in a concerted scheme to artificially inflate prices and limit production of fire apparatus, despite unprecedented levels of demand and an enormous backlog.

3.      The Manufacturer Defendants —the largest fire apparatus manufacturers in the United States—accumulated control of approximately 70–80% of the U.S. fire apparatus market through an aggressive acquisition strategy that eliminated independent competitors and consolidated the industry into three dominant manufacturer groups.

4. Rather than compete, Manufacturer Defendants coordinated with one another, both directly and through their industry organization, FAMA, to exchange confidential sales, order, and pricing data; align pricing strategies; avoid competitive bidding; and restrain production despite soaring demand.

5. FAMA facilitated this conspiracy by operating a confidential, members-only data exchange and by hosting biannual meetings where Defendants further exchanged and discussed confidential information. This coordination is reflected in the uniform pricing structures Manufacturer Defendants submitted to cooperative purchasing organizations used by some local municipalities to purchase fire apparatus.

6. Furthermore, despite unprecedented backlogs and record profitability, Defendants *closed* facilities and restricted output. The results have been devastating.

7. Lead times exploded from 10–12 months to 3–4.5 years, leaving fire departments across the country unable to replace aging, unsafe apparatus. Prices have risen to historic levels. The average cost of a pumper has doubled from roughly $400,000–$500,000 in the mid-2010s to approximately $1 million today, while aerial ladder trucks now routinely exceed $2 million.

8. As a result, Plaintiff and class members have paid supracompetitive prices for fire apparatus and faced years-long delays in receiving equipment essential to protecting their communities. Municipal budgets have been strained, departments have been forced to operate unsafe aging fleets far beyond recommended service life, and public safety has been compromised nationwide.

9. Plaintiff brings this class action under Section 1 of the Sherman Act and Section 7 of the Clayton Act to recover treble damages, obtain injunctive relief, and restore competition to

2

a critical public-safety market. Defendants' unlawful conduct has caused billions of dollars in overcharges, has jeopardized public safety across the country, and continues today.

## II. THE PARTIES

### A. Plaintiff

10. Plaintiff the City of Chelsea ("Chelsea") is a city located in Suffolk County, Massachusetts, directly bordering the city of Boston, with a population of roughly 60,000. The City has its own fire department with approximately 106 firefighters. The fire department has three fire stations, four engines ("pumpers"), and two ladder trucks. These departments respond to approximately 10,000 incidents annually and have faced challenges maintaining a modern fire apparatus fleet to meet the fire protection needs of the city and its residents.

11. Chelsea purchased several fire apparatuses directly from Pierce, including a 2017 custom Pierce Arrow XT (aerial) for approximately $1.2 million, a 2017 Pierce Saber Heavy Rescue for more than $500,000, and a 2018 custom Pierce Enforcer (pumper) for nearly $600,000. Chelsea was injured during the Class Period in connection with its purchases as a result of Defendants' unlawful conspiracy, as alleged in this Complaint.

### B. Defendants

#### 1. Oshkosh Defendants

12. Defendant **Oshkosh Corporation** ("Oshkosh") is a Wisconsin corporation with its principal place of business at 1917 Four Wheel Drive, Oshkosh, Wisconsin. Oshkosh designs, manufactures, and sells commercial and custom fire apparatus under its Pierce and Maxi-Metal brands, primarily to governmental entities and local municipalities, and aircraft rescue and firefighting vehicles under its Oshkosh Airport Products brand to commercial airlines, airports, air-freight carriers, ground handling customers and militaries.

3

13.    Defendant **Pierce Manufacturing, Inc.** ("Pierce") is a Wisconsin corporation with its principal place of business at 2600 American Drive, Appleton, Wisconsin. Pierce is a wholly owned subsidiary of Defendant Oshkosh. With facilities in Appleton, Wisconsin and Bradenton, Florida, Pierce manufactures a full line of custom and commercial fire apparatus and emergency vehicles for sale in the U.S., including pumpers, aerial platforms, ladder and tiller trucks, tankers, light-, medium- and heavy-duty rescue vehicles, wildland rough terrain response vehicles, and other emergency response vehicles. Pierce also manufactures ARFF vehicles for sale in the U.S. through its Oshkosh Airport Products division.

14.    Pierce maintains a corporate sales force for factory direct sales and a network of 20 U.S. based independent dealers to sell both the Pierce and Maxi-Metal branded products and services within exclusive designated territories across the U.S.

### 2.    REV Group Defendants

15.    Defendant **REV Group, Inc.** ("REV Group") is a Delaware corporation with its principal place of business at 245 South Executive Drive, Suite 100, Brookfield, Wisconsin. The REV Group through its operational subsidiaries, designs, manufactures, distributes, and sells commercial and custom Fire Apparatus under the E-ONE, KME, and Ferrara brands, as well as the brands that are part of the Spartan Emergency Response group ("Spartan") – Spartan Emergency Response ("Spartan ER"), Smeal, and Ladder Tower brands.

16.    Defendant **E-ONE, Inc.** ("E-ONE") is a Delaware corporation with its principal place of business at 1601 SW 37th Avenue, Ocala, Florida. E-ONE, Inc. is a wholly owned subsidiary of the REV Group. E-ONE operates manufacturing plants in Ocala, Florida, and Hamburg, New York and manufactures custom and commercial pumpers, tankers, aerial ladders and platforms, rescues, and ARFF vehicles for sale in the U.S.

4

17.    Defendant **Ferrara Fire Apparatus, Inc.** ("Ferrara") is a Louisiana corporation with its principal place of business at 27855 James Chapel Road, Holden, Louisiana. Ferrara is a wholly owned subsidiary of the REV Group. Ferrara operates its primary manufacturing facility in Holden, Louisiana and manufactures a full line of fire apparatus for sale in the U.S., including custom and commercial pumpers, tankers, aerial ladders and platforms, rescues, and wildland apparatus.

18.    Defendant **Kovatch Mobile Equipment Corp.**, ("KME") is a Pennsylvania corporation with its principal place of business at 245 S. Executive Drive Brookfield, Wisconsin. KME is a wholly owned subsidiary of the REV Group. Until April 2022, KME operated manufacturing facilities in Nesquehoning, Pennsylvania and Roanoke, Virginia. After those facilities were closed in April 2022, orders for KME apparatus were transferred to other manufacturing facilities within the REV Group. KME manufactures a full-line of fire apparatus for sale in the U.S., including custom and commercial pumpers, tankers, aerial ladders and platforms, rescues, and wildland apparatus.

19.    Defendant **Spartan Fire, LLC** ("Spartan ER") is a Nevada corporation with a principal place of business at 907 7th Avenue North, Brandon, South Dakota.  Spartan ER is a wholly owned subsidiary of the REV Group and manufactures a full line of fire apparatus under the Spartan ER brand for sale in the U.S., including custom and commercial pumpers, aerial ladders and platforms, tankers, rescues, and wildland apparatus.

20.    Defendant **Smeal SFA, LLC** ("Smeal") is a Michigan Limited Liability Company with a principal place of business at 1541 Reynolds Road, Charlotte, Michigan. Smeal is a wholly owned subsidiary of the REV Group. Smeal manufactures a full line of custom and

commercial pumpers, tender/tankers, aerial ladders and platforms, and rescues for sale in the U.S. under the Smeal brand. Smeal operates a manufacturing facility in Snyder, Nebraska.

21. Defendant **Smeal LTC, LLC** ("Ladder Tower") is a Michigan limited liability company with a principal place of business at 1541 Reynolds Road, Charlotte, MI. Ladder Tower is a wholly owned subsidiary of the REV Group. Ladder Tower has a manufacturing facility in Ephrata, Pennsylvania and specializes in manufacturing custom aerial ladders and platforms for sale in the U.S. under the Ladder Tower brand.

22. The REV Group, E-One, Ferrara, KME, Spartan ER, Smeal, and Tower Ladder are collectively referred to as the "REV Group Defendants."

23. The REV Group Defendants maintain a corporate sales force for factory direct sales and a network of independent dealers that sell their fire apparatus brands and services within exclusive designated territories across the U.S., including approximately 22 dealers representing the E-ONE brand, 15 dealers representing the Ferrara brand, 19 dealers representing the KME brand, and 25 dealers representing the Spartan group of brands.

### 3. Rosenbauer America LLC

24. Defendant **Rosenbauer America LLC** ("Rosenbauer America") is a Delaware limited liability company with its principal place of business at 100 3rd Street, Lyons, South Dakota. Rosenbauer America LLC is the holding company for its North American business and operational subsidiaries, Defendants Rosenbauer South Dakota, LLC and Rosenbauer Minnesota, LLC.

25. **Rosenbauer South Dakota, LLC** ("Rosenbauer SC") is a Delaware limited liability company with its principal place of business in 100 3rd Street, Lyons, South Dakota. Rosenbauer SC is a wholly owned subsidiary of Rosenbauer America. Rosenbauer SC

6

manufacturers fire apparatus for sale in the U.S., including aerials, pumpers, pumpers-tankers/tenders, and special service vehicles.

26. **Rosenbauer Minnesota, LLC** ("Rosenbauer MN") is a Delaware limited liability company with its principal place of business at 5181 260th Street, Wyoming, Minnesota. Rosenbauer MN is a wholly-owned subsidiary of Rosenbauer America. Rosenbauer MN manufactures for sale in the U.S. wildland and brush apparatus, aerials, pumpers, pumpers-tankers/tenders, ARFF vehicles, special service vehicles, and electric/alternative fuel apparatus.

27. Defendants Rosenbauer America, Rosenbauer SD, and Rosenbauer MN are collectively referred to as "Rosenbauer."

28. Rosenbauer maintains a corporate sales force for factory direct sales and a network of 29 U.S. based independent dealers that provide and sell its fire apparatus equipment across the entire United States.

29. Defendants Oshkosh, Pierce, The REV Group Defendants, and Rosenbauer are collectively referred to as the Manufacturer Defendants.

### 4. Fire Apparatus Manufacturers' Association

30. Defendant **Fire Apparatus Manufacturers' Association ("FAMA")** is a not-for-profit trade association for fire apparatus manufacturers located in Ocala, Florida. Approximately 55 of FAMA's 135 members are manufacturers of fire apparatus, including Manufacturer Defendants.

### 5. Co-Conspirators and Agents

31. Various other persons, firms, and corporations not named as Defendants have participated as co-conspirators with Defendants and have performed acts in furtherance of the illegal conduct described in this Complaint. Defendants are jointly and severally liable for the acts of these unnamed co-conspirators. They have participated as co-conspirators with

7

Defendants in the offenses alleged and have performed acts and made statements in furtherance of the contract, combination, or conspiracy to raise prices of fire apparatus.

32. Whenever reference is made to any act of any corporation, the allegation means that the corporation engaged in the act by or through its officers, directors, agents, employees, or representatives while they were actively engaged in the management, direction, control, or transaction of the corporation's business or affairs.

33. Defendants are also liable for acts done in furtherance of the alleged conduct by companies they acquired through mergers and acquisitions.

## III. JURISDICTION AND VENUE

34. This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. §§ 1331 and 1337(a), as this action arises under Sections 1 of the Sherman Antitrust Act, 15 U.S.C. §§ 1, 3, and Sections 4 and 16 of the Clayton Act, 15 U.S.C. §§ 15(a), 26.

35. This Court has personal jurisdiction over each Defendant because they have purposefully availed themselves of the privilege of transacting business in the United States, including this District; have substantial contacts within the United States, including this District; and are engaged in a conspiracy that is aimed at causing, and has caused harm to municipalities and other entities residing, located, or operating in the United States, including this District.

36. Venue is proper in this District under 15 U.S.C. §§ 15, 22 and 28 U.S.C. §1391(b), (c). During the Class Period, one or more Defendants transacted business, were found, or had agents in this District. A substantial part of the events giving rise to Plaintiff's claims occurred in this District, and a substantial portion of the affected interstate trade and commerce was carried out in this District.

8

37. Defendants' conduct, as alleged herein, substantially and foreseeably affected interstate commerce in the United States, including in this District.

38. Defendants sell fire apparatus and their services in the continuous and uninterrupted flow of interstate commerce, including in this District.

## IV. FACTUAL ALLEGATIONS

### A. Background

#### 1. Categories and Types of Fire Apparatus

39. Fire apparatus are specialized vehicles designed for emergency firefighting, rescue operations, and response to hazardous incidents.

40. The 2024 National Fire Protection Association ("NFPA") 1900 Standard for Aircraft Rescue and Firefighting Vehicles, Automotive Fire Apparatus, Wildland Fire Apparatus, and Automotive Ambulances governs the design, performance, and safety requirements for all Fire Apparatus. NFPA 1900 consolidates several previous standards, including NFPA 414 (Aircraft Rescue and Firefighting Vehicles), NFPA 1901 (Automotive Fire Apparatus), NFPA 1906 (Wildland Fire Apparatus), and NFPA 1917 (Ambulances)[1].

41. Under NFPA 1900, Fire Apparatus are grouped into two primary categories, (1) structural fire apparatus used to respond to structural incidents or other non-wildland incidents, and (2) wildland fire apparatus used primarily for wildland fire response. Each category includes multiple apparatus types summarized in the chart below.

---

[1] Ambulances are not the subject of this Complaint.

**Table 1: NFPA 1900 Fire Apparatus Types[2]**

| TYPE OF FIRE APPARATUS | NFPA 1900 DEFINITION |
|---|---|
| **Structural Fire Apparatus** | |
| Pumper | Fire apparatus with a permanently mounted fire pump of at least 750 gpm (3000 L/min) capacity, water tank, and hose body whose primary purpose is to combat structural and associated fires. |
| Initial Attack | Fire apparatus with a fire pump of at least 250 gpm capacity, water tank, and hose body whose primary purpose is to initiate a fire suppression attack on structural, vehicular, or vegetation fires, and to support associated fire department operations. |
| Mobile Water Supply (Tanker, Tender) | A vehicle designed primarily for transporting (pickup, transporting, and delivering) water to fire emergency scenes to be applied by other vehicles or pumping equipment. |
| Aerial | A vehicle equipped with an aerial ladder, elevating platform, or water tower that is designed and equipped to support firefighting and rescue operations by positioning personnel, handling materials, providing continuous egress, or discharging water at positions elevated from the ground. |
| Quint | Fire apparatus with a permanently mounted fire pump, a water tank, a hose storage area, an aerial ladder or elevating platform with a permanently mounted waterway, and a complement of ground ladders. |
| Special Service | A multipurpose vehicle that primarily provides support services at emergency scenes. |
| Mobile Foam | Fire apparatus with a permanently mounted fire pump, foam proportioning system, and foam concentrate tank(s) whose primary purpose is the control and extinguishment of flammable and combustible liquid fires in storage tanks and spills. |
| **Wildland Fire Apparatus** | |
| Wildland Fire Suppression | A fire apparatus designed for fighting wildland fires that is equipped with a pump, a water tank, limited hose and equipment, and pump-and-roll capability. |
| Wildland Mobile Water Supply (Water Tender) | A fire apparatus designed for transporting water (pickup, transporting, and delivering) and fighting wildland fires on and off road that is equipped with a wildland fire pump, a water tank with minimum capacity of 1000 gal (4000 L), limited hose and equipment, and pump-and-roll capability. |
| Wildland Crew Carrier | Fire apparatus designed for transporting 10 or fewer personnel in the cab and crew compartment for the purpose of wildland fire suppression. |

---

[2] NFPA Standard 1900,

42. In addition to structural and wildland fire apparatus, NFPA Standard 1900 also establishes standards for Aircraft Rescue and Firefighting (ARFF) vehicles used to prevent, control, or extinguish aircraft-related fires to ensure a safe exit for occupants through usual or emergency exits.

43. In everyday terminology, fire apparatus are often described as fire trucks and fire engines. Although the terms are sometimes used interchangeably, each serves a distinct operational function based on the equipment it carries.

44. Fire engines (pumpers, tenders, and tankers) carry a water tank, hose, and pump used for fire suppression. They often are first to arrive at the scene to contain a fire.

45. The National Wildfire Coordinating Group ("NWCG"), which coordinates wildland fire operations among federal, state, local, Tribal, and territorial partners, classifies seven types of structural (Types 1-2) and wildland (Types 3-7) fire engines based on minimum requirements for tank capacity, pump flow, hose size, number of personnel, and other requirements. An overview of those requirements are below:

11



| SPECS | STRUCTURE | | WILDLAND BRUSH TRUCKS | | | | |
|---|---|---|---|---|---|---|---|
| | TYPE 1 | TYPE 2 | TYPE 3 | TYPE 4 | TYPE 5 | TYPE 6 | TYPE 7 |
| TANK MIN. CAPACITY (GAL) | 300 | 300 | 500 | 750 | 400 | 150 | 50 |
| PUMP MIN. FLOW (GPM) | 1000 | 500 | 150 | 50 | 50 | 50 | 10 |
| @ RATED PRESSURE (PSI) | 150 | 150 | 250 | 100 | 100 | 100 | 100 |
| HOSE 2½" (MIN. FT) | 1200 | 1000 | ✗ | ✗ | ✗ | ✗ | ✗ |
| HOSE 1½" (MIN. FT) | 500 | 500 | 1000 | 300 | 300 | 300 | ✗ |
| HOSE 1" (MIN. FT) | ✗ | ✗ | 500 | 300 | 300 | 300 | 200 |
| LADDERS | ✓ | ✓ | ✗ | ✗ | ✗ | ✗ | ✗ |
| PUMP AND ROLL | ✗ | ✗ | ✓ | ✓ | ✓ | ✓ | ✓ |
| MAX. GVWR (LBS) | ✗ | ✗ | ✗ | ✗ | 26,000 | 19,500 | 14,000 |
| PERSONNEL (MIN.) | 4 | 3 | 3 | 2 | 2 | 2 | 2 |
| TYPICAL USES | STRUCTURAL FIRE RESPONSE | STRUCTURAL FIRE RESPONSE | BRUSH FIRE RESPONSE | BRUSH FIRE RESPONSE | INITIAL ATTACK, BRUSH PATROL | INITIAL ATTACK, BRUSH PATROL | PATROL, MOP UP, INITIAL ATTACK |

✓ REQUIRED   ✗ NOT REQUIRED/OPTIONAL

**Figure 1.** NWCG Types of Fire Engines.[3]

46.     Fire trucks, by contrast, are equipped with aerial ladders or platforms and an array of specialized rescue tools, such as axes, power saws, hydraulic rescue tools (e.g. Jaws of Life), ventilation equipment, and ground ladders. Fire trucks provide support and rescue capabilities through forced entry, search and rescue, ventilation, and elevated access.

47.     Among all types of fire apparatus, about 75% are pumpers.[4]

---

[3] *Types of Fire Trucks and Their Purpose*, BME Fire Trucks (Feb. 21, 2022), https://www.bmefire.com/types-of-fire-trucks/.

[4] Alan M. Petrillo, *What's the Right Size Pump for Your Apparatus and How Does It Affect the Design?*, FIRE APPARATUS & EMERGENCY EQUIPMENT (Sept. 27, 2023), https://www.fireapparatusmagazine.com/fire-apparatus/pumpers/whats-the-right-size-pump-foryour-apparatus-and-how-does-it-affect-the-design.

12

48. For purposes of this Complaint, "fire apparatus" refers to all categories and types of fire apparatus and ARFF vehicles recognized by NFPA 1900, as well as the seven types of fire engines recognized by the NWCG.

### 2. The Fire Apparatus Industry

49. The modern Fire Apparatus industry emerged following World War II. During the war, manufacturers diverted their operations to produce over 8,500 fire apparatus for the military.[5] This left local fire departments with ageing and inadequate fleets. When operations returned to normal post-war, manufacturers sought to incorporate the wartime advances in engines, hydraulics, steel fabrication, and vehicle electrification into their commercial apparatus.

50. The industry boomed in the decades that followed. Small and midsized fire apparatus manufacturers – typically family-owned operations – were present in every region of the country. By 2015, the industry was fragmented and competitively diversified among approximately two-dozen manufacturers.[6] Competition was fierce, prices were kept near costs, and manufacturing capacity was sufficient to meet the market's demand. Prices remained relatively stable, increasing annually by about 3% adjusted for inflation.[7]

51. When the Great Recession hit in 2008, municipal budget cuts led to a significant decline in Fire Apparatus sales. By 2011, sales of Fire Apparatus had declined more than 40%

---

[5] James Clifford, *U.S. Army Fire Trucks 1925-1942*, THE ARMY HISTORICAL FOUNDATION (2023), https://armyhistory.org/u-s-army-fire-trucks-1925-1942/#:~:text=Just%20before%20the%207%20December%201941%20attack,trucks%20of%20all%20types%20for%20the%20military.

[6] *What a Competitive Strategy Analyst Thinks About the Fire Apparatus Industry*, Fuld & Company, (circa 2015), https://www.fuld.com/what-a-competitive-strategy-analyst-thinks-about-the-fire-apparatus-industry/ (last visited Nov. 15, 2025).

[7] Basel J. Musharbash. *Testimony before the United States Senate Committee on Homeland Security and Governmental Affairs Subcommittee on Disaster Management, District of Columbia, and Census* (Sept. 10, 2025), https://www.hsgac.senate.gov/wp-content/uploads/Musharbash-Testimony.pdf.

from its earlier peak.[8] The market struggled to recover. Although it saw a slight increase in North American sales in 2013, sales decreased again in 2014 by 5-10%.[9]

52.     The instability caused by the Great Recession sparked an aggressive acquisition strategy among U.S. brands that led to the consolidation of approximately 70-80 precent of the Fire Apparatus market with Defendants REV Group, Oshkosh, and Rosenbauer. With the assistance of FAMA, the trio's market power eliminated the fierce competition that once existed, doubled prices of fire apparatus, and restricted supply to extremely low levels, causing unnecessary risks to our nation's first responders and those they seek to protect.

**B.      Defendants Engaged in an Aggressive Acquisition Strategy to Gain Monopoly Power in the Fire Apparatus Industry**

**1.      AIP and REV Group**

53.     Taking advantage of the turbulent market created by the Great Recession, Wall-Street-based private-equity firm, American Industrial Partners ("AIP"), began rolling up multiple Fire Apparatus manufacturers.

54.     On August 5, 2008, AIP announced its first acquisition of E-ONE for $20 million – a leading supplier of a full line of Fire Apparatus including aerials, pumpers, and ARFF vehicles.[10]

55.     On August 24, 2010, AIP announced the formation of Allied Specialty Vehicles, Inc. ("ASV"). ASV was formed through the combination of E-ONE, and three other companies

---

[8] Paul C. Darley, *The Fire Apparatus Market is Coming Back … Just Look at the Data*, FIRE APPARATUS MANUFACTURERS ASSOCIATION (Dec. 5, 2015, https://www.fama.org/forum_articles/the-fire-apparatus-market-is-coming-backjust-look-at-the-data/.

[9] *Id*.

[10] *American Industrial Partners Announces Acquisition of E-ONE, Inc., a subsidiary of Federal Signal Corporation*, AMERICAN INDUSTRIAL PARTNERS (Aug. 5, 2008), https://americanindustrial.com/american-industrial-partners-announces-acquisition-of-e-one-inc-a-subsidiary-of-federal-signal-corporation/.

in AIP's portfolio. With revenue of approximately $1 billion, ASV became a market leader in the Fire Apparatus and other specialty vehicle markets.[11]

56.     ASV changed its name to REV Group on November 1, 2015.[12] REV Group's then CEO, Timothy M. Sullivan, explained the meaning behind the new name and the company's plans: "Like a revving engine letting bystanders know a car is preparing for a quick acceleration, REV communicates to the world that we are set for growth."[13]

57.     True to its new name, REV Group's acquisition strategy kicked into high gear.

58.     On April 11, 2016, REV Group announced its acquisition of family-owned KME for $40 million. At that time, KME had manufacturing facilities in Pennsylvania and Virginia and sales and service centers in New York, and California. In April 2022, REV Group permanently closed KME's Pennsylvania and Virginia manufacturing facilities.[14]

59.     On April 25, 2017, REV Group acquired family-owned Ferrara for $100 million – a leader in custom fire apparatus and rescue vehicle. Ferrara's annual revenue at the time was $140 million.[15] According to Dan Peters, President of REV's Fire Group, "The addition of Ferrara to the REV Fire Group enables a number of new growth opportunities including

---

[11] *American Industrial Partners Announces the Formation of Allied Specialty Vehicles, Inc., a Leading Manufacturer of Specialty Vehicles in North American*, AMERICAN INDUSTRIAL PARTNERS (Aug. 24, 2010), https://americanindustrial.com/american-industrial-partners-announces-the-formation-of-allied-specialty-vehicles-inc-a-leading-manufacturer-of-specialty-vehicles-in-north-america/.

[12] *Allied Specialty Selects REV as New Company Name*, FIRE APPARATUS & EMERGENCY EQUIPMENT, (Nov. 2, 2015), https://www.fireapparatusmagazine.com/fire-apparatus/ambulances/allied-specialty-vehicles-selects-rev-as-new-company-name/.

[13] *Id*.

[14] *KME's Nesquehoning facility closing stuns community, leaves Carbon County officials, lawmakers blindsided*, THE MORNING CALL (Sept. 14, 2021), https://www.mcall.com/2021/09/14/kmes-nesquehoning-facility-closing-stuns-community-leaves-carbon-county-officials-lawmakers-blindsided/.

[15] REV Group, Inc., *REV Group Acquires Ferrara Fire Apparatus, Inc.* (Apr. 25, 2017), https://investors.revgroup.com/investor-releases/2017/04-25-2017-182251523.

Case 1:26-cv-00573-WCG     Filed 12/02/25     Page 18 of 68     Document 1

expansion of our reach nationwide and adding new geographical regions and key accounts." Explaining the significance of the acquisition, REV Groups' CEO, Tim Sullivan, stated that "Ferrara will immediately contribute strategic value by expanding the REV Fire Group national footprint, dealer sales network, service and after-market parts revenue as well as enhancing our robust line of custom chassis and aerial products for multiple market segments."[16]

60. Despite already holding a substantial share of the market, REV Group was not satisfied with its control over E-ONE, KME, and Ferrara—each a prominent Fire Apparatus brand in its own right – and continued to further consolidate the market.

61. On February 3, 2020, REV Group announced the completion of its acquisition of Spartan Emergency Response and its brands Spartan Fire Apparatus and Chassis, Smeal Fire Apparatus, Ladder Tower, and UST for $55 million. As of September 30, 2019, Spartan Emergency Response net revenues for the preceding 12 months were $253.3 million.[17]

62. With its acquisition of the Spartan and Smeal aerial brands, REV Group now held approximately half of the North American market for aerials – some of the highest priced and margin products.[18]

63. By acquiring the Spartan Fire Chassis brand, the REV Group gained control over the market for custom chassis – the structural foundation of fire apparatus. Spartan's custom

---

[16] *Id.*

[17] Rev Group, Inc., *REV Group, Inc. Completes Acquisition of Spartan Emergency Response* (Feb. 3, 2020), https://investors.revgroup.com/investor-releases/2020/02-03-2020-135942281. Spartan Emergency Response had previously acquired Smeal Fire Apparatus in May 2017, which included its subsidiaries Smeal, and Ladder Tower Company. *Spartan Motors, Inc. acquires Smeal Fire Apparatus Company,* FESCO EMERGENCY SALES (May 23, 2017), https://fescosales.com/wp-content/uploads/2021/02/Spartan-Acquires-Smeal-Press-Release-01.16.17.pdf.

[18] REV Group, Q1 2020 Earnings Call, SEEKING ALPHA, (March 5, 2020), https://seekingalpha.com/article/4330123-rev-group-inc-revg-ceo-timothy-sullivan-on-q1-2020-results-earnings-call-transcript.

chassis are integrated into the fire apparatus manufactured by at least 31 smaller, independent manufacturers. The REV Group's control over this critical input has further constrained the overall supply of fire apparatus.[19]

64.    REV Group's serial acquisitions of the following seven brands reduced competition and sealed its position as a dominant force in the Fire Apparatus market.



**Figure 2.** Summary of REV Group Acquisitions of Fire Apparatus Companies.[20]

65.    With its market power established, REV Group sought to maintain the independence of its subsidiaries and their dealers but warned that aggressive or "negative" competition among its subsidiaries would not be tolerated.[21]

66.    In a 2021 investor presentation, REV Group highlighted a new "platforming" and "channel management" strategy for its subsidiaries to "[c]onverge on common designs that can be shared across brands," and to use Spartan's Metro Star chassis/cab as the "platform" for their offerings. It further centralized operations to manage "margin improvement actions" across the board.[22]

---

[19] Spartan Fire Chassis, OEM Partners, https://spartanfirechassis.com/oem-partners/ (last visited Nov. 25, 2025); Musharbash Testimony, at 4, *supra* at note 6.

[20] *Investor & Analyst Day* (PDF), REV GROUP, INC. (April 15, 2021), https://investors.revgroup.com/~/media/Files/R/Rev-IR/reports-and-presentations/rev-group-investor-day-v18.pdf.

[21] Basel Musharbash, *Did a Private Equity Fire Truck Roll-Up Worsen the L.A. Fires?*, THE BIG NEWSLETTER (Jan. 25, 2025), https://www.thebignewsletter.com/p/did-a-private-equity-fire-truck-roll.

[22] *Id.*

67. REV Group explained to shareholders that its goal was to double the fire apparatus companies' profitability. Timothy Sullivan, REV Group's CEO, told analysts that the companies REV Group had profit margins of 4 to 5 percent, and that REV Group was on a path "to get all of them above that 10 percent level."[23]

### 2. Oshkosh and Pierce

68. Endorsing the aggressive acquisition strategy of its competitors, Oshkosh CEO, Wilson Jones, CEO, told investors in 2017, "We're certainly glad to see more companies consolidating especially publicly traded companies. We think that will help drive better discipline from a pricing standpoint in the market."[24]

69. Oshkosh announced in September 2021 that its subsidiary, Pierce, acquired a 25% ownership interest in BME Fire Trucks, LLC ("BME") for $5.1 million.[25] BME is a leading manufacturer of wildland fire apparatus in Boise, Idaho.

70. Pierce's investment in BME would strengthen collaboration in the wildland fire apparatus segment with a focus on the west coast and would support BME's transition from a factory-direct sales model to reliance on a network of independent dealers.[26]

---

[23] Mike Baker, Maureen Farrell & Serge F. Kovaleski, *As Wall Street Chases Profits, Fire Departments Have Paid the Price*, N.Y. TIMES (Feb. 17, 2025), https://www.nytimes.com/2025/02/17/us/fire-engines-shortage-private-equity.html.

[24] Oshkosh Corp., Q2 Earning Call Transcript (July 25, 2017), https://seekingalpha.com/article/4065631-oshkosh-osk-q2-2017-results-earnings-call-transcript.

[25] Oshkosh Corp., *Pierce Manufacturing Completes Ownership Interest in Boise Mobile Equipment* (Sept. 16, 2021), https://www.investors.oshkoshcorp.com/news/pierce-manufacturing-completes-ownership-interest-in-boise-mobile-equipment/16c54803-9007-4e9e-82f2-e6253396d4e0/.

[26] Pierce Mfg*., Pierce Manufacturing Completes Ownership Interest in Boise Mobile Equipment* (Sept. 16, 2021), https://www.piercemfg.com/pierce/press-release/pierce-manufacturing-completes-ownership-interest-in-boise-mobile-equipment.

18

71. On June 13, 2022, Oshkosh acquired Maxi-Metal, Inc. for $19.7 million. Maxi-Metal is headquartered in Quebec, Canada and is a leading designer and manufacturer of custom Fire Apparatus across North America.[27]

72. The relationship between Pierce and Maxi-Metal, however, began in 2015 when the two companies agreed to collaborate, design and build a fire apparatus (the Maxi Saber) for the Canadian market through the Pierce dealer network. Later in 2016, the two collaborated again to exclusively distribute a Maxi-Metal built line of pumpers and tankers (the Contender) under the Maxi-metal brand in the United States through the Pierce dealer network.[28]

73. The Maxi-Metal acquisition positioned Oshkosh with control over a quarter of the U.S. Fire Apparatus market.

74. Pierce and Maxi-Metal assign exclusive territories, typically by state, to each of their authorized independent dealers, reducing inter-dealer competition.[29] In addition to its acquisition strategy, Oshkosh was consolidating these dealers while preserving Pierce's exclusive territories to limit inter-dealer competition. Starting in 2018, a series of acquisitions by Pierce dealers effectively created single-dealer distribution monopolies in the upper Midwest, the Southwest, and much of New England.[30]

75. In July 2018, MacQueen Emergency Group ("MacQueen"), a Pierce subsidiary and the exclusive Pierce dealer for Minnesota, Nebraska, South Dakota, and North Dakota,

---

[27] Oshkosh Corp., *Oshkosh Corporation acquire Maxi-Metal Inc.* (June 13, 2022), https://www.oshkoshcorp.com/news/2022/6-13-22-maxi-metal.

[28] MaxiMetal, About Us, https://www.maximetal.com/about-us/pierce-partnership/ (last visited Nov. 17, 2025).

[29] Pierce, Inc., Find a Dealer, https://www.piercemfg.com/find-a-dealer (last visited Nov. 16, 2025); https://www.maximetal.com/find-a-dealer/ (last visited Nov. 16, 2025).

[30] Musharbash Testimony, at 5, *supra* note 6.

acquired Schuhmacher Fire Equipment. This acquisition expanded MacQueen's control over the upper Midwest to include 109 counties in eastern Missouri.[31] A separate dealer, Conrad Fire Equipment, continued as the exclusive dealer for western Missouri.[32]

76. On January 21, 2019, Pierce announced that its dealer Siddons-Martin Emergency Group ("Siddons"), then the exclusive dealer for Texas, Louisiana, and New Mexico, acquired Superior Equipment. The acquisition added Utah and Nevada to Siddon's exclusive territory.[33] Siddons territory, however, excluded Clark County, Nevada, which is served exclusively by Hughes Fire Equipment Inc.[34]

77. On April 6, 2023, Pierce announced that Siddons further consolidated its control by acquiring Emergency Vehicle Specialist, which gave Siddons control over two additional states: Arkansas and Tennessee. After this acquisition, Siddons exclusively serves seven states.[35]

78. On November 19, 2019, Pierce announced that Allegiance Fire and Rescue ("Allegiance") acquired Minuteman Fire and Rescue. The acquisition provided Allegiance with

---

[31] Pierce Mfg., *MacQueen Emergency Group Territory Expanded to Include 109 Missouri Counties* (July 10, 2018), https://www.piercemfg.com/pierce/press-release/macqueen-emergency-group-territory-expanded-to-include-109-missouri-counties.

[32] *Id*. *See also* Pierce Mfg., Find a Dealer (Conrad Fire Equipment, Inc.), https://www.piercemfg.com/find-a-dealer (last visited Nov. 17, 2025).

[33] Siddons-Martin Emergency Group Expands Territory with Acquisition of Superior Equipment (Jan. 21, 2020), https://www.piercemfg.com/pierce/press-release/siddons-martin-emergency-group-expands-territory-with-acquisition-of-superior-equipment.

[34] *Id*., *See also*, Find a Dealer, Hughes Fire Equipment, Inc., https://www.piercemfg.com/find-a-dealer (last visited Nov. 17, 2025).

[35] Pierce Mfg., *Pierce Dealer, Siddons-Martin Emergency Group, Broadens Territory with Acquisition of Emergency Vehicle Specialist* (Apr. 6, 2023), https://www.piercemfg.com/pierce/press-release/pierce-dealer-siddons-martin-emergency-group-broadens-territory-with-acquisition-of-emergency-vehicle-specialists.

exclusive control over most of New England: Maine, Massachusetts, New Hampshire, Rhode Island, and Vermont.[36]

79. On September 1, 2023, Pierce announced that Firematic Supply Co. Inc. ("Firematic"), then the exclusive Pierce dealer for eastern New York and Connecticut acquired Churchville Fire Equipment, expanding its regions served to include all of New York.[37]

80. Most recently, on June 12, 2025, Pierce announced that Reliant Fire Apparatus ("Reliant") acquired Halt Fire, Inc.. Reliant's acquisition expanded its territory to Michigan, in addition to its Wisconsin and Iowa assigned territory.[38]

81. The consolidation of Pierce's independent dealers has given Pierce dealers exclusive control across vast territories, have reduced or eliminated competition among Pierce subsidiaries.

### 3. Rosenbauer

82. Prior to April 2022, Rosenbauer International A.G. held a 50 percent stake in Rosenbauer America. Following the consolidation efforts by REV Group and Oshkosh, Rosenbauer International A.G. finalized its purchase of an additional 25 percent from a minority shareholder on April 29, 2022, to increase its share in Rosenbauer America to 75 percent.[39]

---

[36] Allegiance Fire & Rescue, *Minuteman Fire and Rescue Acquired By Allegiance Fire and Rescue* (Nov. 18, 2019), https://allegiancefr.com/minuteman-fire-and-rescue-acquired-by-allegiance-fire-and-rescue/.

[37] Pierce Mfg., *Pierce Dealer Firematic Supply Co. Grows Presence in Northeast with Acquisition of Churchville Fire Equipment* (Sept. 1, 2023), https://www.piercemfg.com/pierce/press-release/pierce-dealer-firematic-supply-co.-grows-presence-in-northeast-with-acquisition-of-churchville-fire-equipment.

[38] Pierce Mfg., *Reliant Fire Apparatus Acquires Halt Fire, Inc. Expands Pierce Dealership Territory to Include the State of Michigan* (June 12, 2025), https://www.piercemfg.com/pierce/press-release/reliant-fire-apparatus-acquires-halt-fire-inc.-expands-pierce-dealership-territory-to-include-the-state-of-michigan.

[39] Rosenbauer, *Rosenbauer International increases stakes in Rosenbauer American* (Apr. 29, 2022), https://www.rosenbauer.com/en/company/investor-relations/financial-news/2022/04/rosenbauer-international-increases-stakes-in-rosenbauer-america.

83. Like Pierce, Rosenbauer's dealers are assigned exclusive territories, reducing inter-dealer competition.



**Figure 3.** Exclusive geographic territories of Rosenbauer dealers.[40]

### C. Manufacturer Defendants Cooperate with One Another to Avoid Competing

84. In addition to pursuing a strategy of serial acquisitions and minimizing competition among their own brands, the Manufacturer Defendants have also collaborated with one another to avoid competition.

85. For instance, Mike Virnig, Vice President of Sales for Rev Group's Fire Group, stated: "What I won't tolerate is negative selling. I won't tolerate it with our competitors, and I

---

[40] Rosenbauer, Find a Dealer, https://web.archive.org/web/20250501023624/https://rosenbaueramerica.com/find-a-dealer/ (last visited Nov. 25, 2025).

won't tolerate it within the group. If I even get a hint or see anything like a dealer taking a shot at another dealer, we step in and say, 'Stop it.'"[41]

86.     A REV Group executive likewise informed analysts that the company intended to significantly increase its profit margins and that other firms in the industry were pursuing similar strategies.[42]

87.     Executives for the Manufacturer Defendants repeatedly spoke of "price discipline." Oshkosh CEO, Wilson Jones, told investors that the consolidation occurring in the market "will help drive better discipline from a pricing standpoint in the market."[43]

88.     REV Group CEO, Tim Sullivan, similarly noted, "[p]rices go up every year," and that REV Group was "very pleased with the discipline[] within the fire and emergency markets."[44] He later commented that "we are going to be kind of even up with our competitors across the board" and "all of us have been at least the large fire brass manufacturers have been doing fine we all have big backlogs and we're all taking a little bit of share from more of the smaller regional players."[45]

---

[41] Ed Ballam, *REV Group Invests in the Strength of Fire Apparatus Brands*, FIRE APPARATUS MAGAZINE (July 1, 2020), https://www.fireapparatusmagazine.com/fire-apparatus/ladder-trucks/rev-group-invests-in-the-strength-of-fire-apparatus-brands/.

[42] Mike Baker, *Senators Investigate Private Equity Role in Soaring Fire-Truck Costs*, N.Y. TIMES (Apr. 15, 2025), https://www.nytimes.com/2025/04/15/us/private-equity-fire-trucks-congress-investigation.html (emphasis added).

[43] Oshkosh Corp., Q2 Earning Call Transcript (April 26, 2017), https://seekingalpha.com/article/4065631-oshkosh-osk-q2-2017-results-earnings-call-transcript.

[44] REV Group, Inc., Q1 Earnings Call Transcript (Mar. 8, 2018), https://seekingalpha.com/article/4154909-rev-groups-revg-ceo-tim-sullivan-on-q1-2018-results-earnings-call-transcript.

[45] REV Group, Inc., Q4 Earnings Call Transcript (Dec. 20, 2018), https://seekingalpha.com/article/4229537-rev-group-revg-ceo-tim-sullivan-on-q4-2018-results-earnings-call-transcript.

89. A few years later in 2020, John Pfeifer, Oshkosh's then President and COO, explained, "[O]n the pricing front, we've maintained a positive price/cost equation for the year. We're very careful and very disciplined in how we manage our pricing. We are the market leader and we'll stay disciplined."[46]

90. Industry insider Jerry Halpin, the co-owner and vice president of sales and marketing for C.E.T. Fire Pumps, noted in 2022 that "people in the fire service industry are talking amongst themselves" and are looking "to bolster opportunities through partnerships and other alliances."[47] He also predicted "cooperation between like businesses to gain an edge in the marketplace."[48]

### D. Manufacturer Defendants Exchange Confidential and Proprietary Information Through FAMA

91. Established in 1946 by a small group of manufacturers, FAMA, then known as the Fire Truck Manufacturers' Association, aimed to pool industry ideas on new technology and improve safety standards within the fire service industry.[49]

92. In addition to supporting safety in the industry, today, FAMA's "overall goal is to improve business conditions and to advance and protect the interests of the fire and emergency services industry, through the use of effective open communication."[50]

---

[46] Oshkosh Corp., Q4 Earnings Call Transcript (Oct. 29, 2020), https://seekingalpha.com/article/4382859-oshkosh-corp-osk-ceo-wilson-jones-on-q4-2020-results-earnings-call-transcript.

[47] Ed Ballam, *2022 Was Good for Fire Service Industry; 2023 is Uncertain*, FIRE APPARATUS MAGAZINE (Dec. 20, 2022), https://www.fireapparatusmagazine.com/fire-apparatus/2022-was-good-for-fire-service-industry-2023-is-uncertain/.

[48] *Id*.

[49] FAMA, Our History, https://www.fama.org/history/ (last visited Nov. 17, 2025).

[50] *Id*.

93. The Manufacturer Defendants are members of Defendant FAMA through which they coordinate by exchanging statistical reports and through in-person biannual industry-wide meetings.

### 1. FAMA Statistical and Survey Reports

94. FAMA operates as the principal conduit for the exchange of confidential information among Manufacturer Defendants. According to FAMA, access to competitors' data is "one of the most valuable reasons" for companies to join the organization.[51] And FAMA promotes "industry statistics" as the number one reason to join FAMA.



**Figure 4.** FAMA Promotional Flyer.[52]

95. Indeed, the president of FAMA's board of directors stated that FAMA's "mission" is to "maximize profits of FAMA member companies."

---

[51] Paul C. Darley, *The Fire Apparatus Market is Coming Back … Just Look at the Data*, FAMA (Dec. 4, 2015 https://www.fama.org/forum_articles/the-fire-apparatus-market-is-coming-backjust-look-at-the-data/.

[52] FAMA, Join FAMA and See What's In It For You! (PDF), https://www.fama.org/wp-content/uploads/2015/07/Top_10_reasons_to_join_FAMA_lowres.pdf (last visited Nov. 18, 2025).

96. By 2016, FAMA had established two committees to collect and distribute Manufacturer Defendants' data: (1) the Education Survey Committee, and (2) the Statistics Committee. The Education Survey Committee's mission was "to help strengthen the FAMA member companies by providing valuable data" through an Industry Outlook Survey and Member Outlook Surveys.[53] The objective of the Statistics Committee "is to provide valuable statistical data to the member companies."[54]

97. The two committees were later merged in March 2023 and renamed the Data & Research Committee to "facilitate the collection of *more* actionable data for the business planning needs of member companies."[55] The collection and distribution of apparatus and pump orders and delivery statistics would also continue.[56]

98. The stated mission of the Data & Research Committee is "to help strengthen FAMA member companies by providing actionable data for strategic business planning" which "includes economic data, fire market trends, and apparatus sales and order statistics."[57] Its objectives are two-fold: (1) "collect and distribute data regarding apparatus sales and orders on a quarterly basis," and (2) "gather data from various sources that is helpful in business planning by member companies."

---

[53] FAMA, Education-Surveys Committee, https://web.archive.org/web/20220521230134/https://www.fama.org/about-fama/committees/education/ (last visited Nov. 18, 2025).

[54] FAMA, Statistics Committee, https://web.archive.org/web/20220521225937/https://www.fama.org/about-fama/committees/statistics/ (last visited Nov. 18, 2025).

[55] FAMA, Spring Membership Business Meeting (March 20-21, 2023) (PDF), https://www.fama.org/wp-content/uploads/2023/10/1696512292_651eb924870f7.pdf (emphasis added).

[56] *Id*.

[57] FAMA, Data & Research Committee, https://www.fama.org/data-research-committee/ (last visited Nov. 13, 2025).

99. The data collected and distributed by FAMA's Data & Research Committee is "the most comprehensive data set in the industry."[58]

100. Manufacturer Defendants played central roles in FAMA's data committees. For example, during the Class Period, Phil Gerace of KME and Jerry Conley of Pierce served as co-chairs of the Education-Survey Committee and Mike Schoenberger of Rosenbauer, Drew Kirvida of Rosenbauer, Mike Moore of Pierce, and John Schultz of Pierce served as chairs of the Statistics Committee/Data & Research Committee.

101. The Data & Research Committee maintains a secure portal for its members to submit their apparatus orders and delivery data on a quarterly basis. The data is forwarded to an accounting firm that compiles the data and returns it to the Data & Research Committee chair(s) for publication on FAMA's secure member-only portal.[59]

102. Once logged into the portal, members can access FAMA's "interactive" data and perform detailed searches of orders by date, vehicle class, axles, and apparatus type. Members can then export the data to an Excel, CSV, or PDF file to incorporate into their own business planning.

---

[58] *FAMA Releases Fire Apparatus Industry Update*, FIRE ENGINEERING (May 30, 2025), https://www.fireengineering.com/fire-apparatus/fama-releases-fire-apparatus-industry-update/.

[59] FAMA, Data & Research Committee, https://www.fama.org/data-research-committee/ (last visited Nov. 18, 2025).

# Interactive



1) This is for booked data not shipped.
2) Enter the date range that you are looking for.
3) Also, filter using any of the drop downs.
4) Hitting search bring the data below.
5) You can export this data to excel.

**Figure 5.** FAMA Web Portal for Interactive Statistics Data.[60]

103.     The web portal also provides access to the "Raw Data" and a range of additional

options such as bookings. This data too can be exported for business planning purposes.



**Figure 6.** FAMA Web Portal for Raw Data.[61]

---

[60] FAMA, 2022 Spring Meeting Presentation (PDF), at 116, https://www.fama.org/wp-content/uploads/2022/03/1646772096_6227bf80d4238.pdf (last visited Nov. 19, 2025).

[61] *Id.* at 118.

104. FAMA tightly controls access to its comprehensive data set. Only members of FAMA may access its secure website portal. To join FAMA, an entity must (a) be "engaged in the manufacture of fire fighting or fire protection apparatus, including rescue vehicles," or (b) "manufacture components or products which are incorporated by the manufacturer as a permanent part of the completed fire apparatus . . . such as chassis, fire pumps, fire hoses, hose reels, ladders, aerial devices, apparatus valves and other water control appliances."[62] Further, in a give-to-get situation, "[o]nly those companies that participate in the statistical studies and members are privy to these reports."[63]

105. Access to the data FAMA collects "may be denied" to any company "that was given the opportunity to participate in the program but refused" or any company "that does not agree in advance of participation to keep the results confidential."[64]

106. Notably, those who purchase and employ fire apparatus to carry out their public service, such as fire departments and municipalities, cannot join FAMA and therefore access the confidential data exchanged between Defendants.

107. The proprietary and confidential nature of this information exchange is reflected in the warning FAMA extends when it announces the availability of a new report. In bold red text, FAMA warns that the statistics and reports are "CONFIDENTIAL" and shall not be disclosed to non-members:

---

[62] FAMA, Why Join, https://www.fama.org/why-join/ (last visited Nov. 18, 2025).

[63] *Id*.

[64] FAMA, Data & Research Committee, https://www.fama.org/statistics/ (last visited Nov. 18, 2025).

*FAMA statistics and reports are CONFIDENTIAL and are available only to member companies. FAMA data shall not be distributed, repurposed or exchanged with any non-member parties.*

**Figure 7.** FAMA Confidential Data Warning.[65]

108. Manufacturer Defendants used the sensitive economic data FAMA shared with them to coordinate price increases and suppress production. They also used FAMA to monitor their co-conspirators to ensure continued adherence to the conspiracy.

109. Each Manufacturer Defendant exchanged this data with the understanding that it would be reciprocated by the others. FAMA enforced this understanding by requiring Defendants to share data in order to receive comparable data.

110. Defendants used the data obtained through FAMA to reduce the uncertainty that they each should have faced from not knowing what their competitors were offering and providing in the fire apparatus market.

> **2.** **FAMA Bi-Annual Meetings Presented Manufacturer Defendants with the Opportunity to Further Exchange and Discuss Competitively Sensitive Information**

111. In addition to exchanging their economic data through FAMA's member-only secure web portal, Manufacturer Defendants routinely attended FAMA's bi-annual meetings, which "provide a forum [for members] to share information" and network with each other.[66] Exhibit A identifies examples of FAMA meetings during the Class Period and the Manufacturer Defendants in attendance.

---

[65] FAMA, 2017 Letter to All FAMA Members (PDF), https://www.fama.org/wp-content/uploads/2017/05/1494518464_59148ac0cc41b.pdf (last visited Nov. 25, 2025).

[66] FAMA, Join FAMA and See What's In It For You., https://www.fama.org/wp-content/uploads/2015/07/Top_10_reasons_to_join_FAMA_lowres.pdf (last visited Nov. 18, 2025).

112. During these meetings, the Manufacturer Defendants listened to presentations and reports on the statistical data collected, including OEM market share, market trends, industry backlogs, and sales forecasting, as well as results of the Industry and Member Outlook surveys.

113. As one manufacturer reported after attending a FAMA meeting, "I'll tell you, all of the talk down there was about industry statistics. And, while I can't share those details with you, unless you're a FAMA member, what I can tell you is last year in 2022, there were over 6000 new fire apparatus sold here in the United States."[67]

114. Attendees also participate in "purchasing roundtables," FAMA-member-only meetings, and discussion groups.

115. These meetings provided the Manufacturer Defendants with sufficient time and opportunity to exchange sensitive economic information and coordinate supply restrictions and price increases.

116. Outside of the bi-annual meetings, FAMA "communicates with its members on a regular basis via emails, its website and an extensive FAMA newsletter," offering additional opportunities for Manufacturer Defendants to communicate and coordinate.[68]

**E. Manufacturer Defendants Submit Uniform Pricing to Governmental Cooperative Purchasing Consortiums, Undercutting Competitive Bidding**

117. Manufacturer Defendants further restrained competition by submitting uniform, non-competitive pricing structures for key products to governmental cooperative purchasing organizations, including Sourcewell and Houston-Galveston Area Council ("HGAC") – the

---

[67] Inside Darley April 2023, DARLEY (Mar. 31, 2023), https://www.darley.com/media/inside-darley-april-2023/.

[68] FAMA, Join FAMA and See What's In It For You!, https://www.fama.org/wp-content/uploads/2015/07/Top_10_reasons_to_join_FAMA_lowres.pdf (last visited Nov. 19, 2025).

primary cooperative organizations used by government and municipal entities to purchase Fire Apparatus.

118.     For example, in response to Sourcewell's October 12, 2021 Request for Proposals, Defendants Pierce, Ferrara, and KME each submitted coordinated pricing for custom pumpers, tankers, rescues, and aerials at 5% off their respective list prices.

119.     Not only did these Manufacturer Defendants coordinate their pricing to Sourcewell, but they offered the same pricing structure to another cooperative purchasing organization – HGAC to further avoid competing on price. Defendants Pierce, Ferrara, KME, and E-One each submitted the same 5% discount off custom pumpers, tankers, rescues, and aerials in response to HGAC's July 26, 2023 Request for Proposals.

120.     Pierce was so bold to disclose in its Response to Sourcewell's Solicitation that it "will not favor one GPO over another" and its "pricing model is consistent across all."[69]

121.     Instead of competing independently for each cooperative solicitation, Manufacturer Defendants submitted identical pricing structures—both to each other and across solicitations—regardless of the competitive environment or purchasing group.

   **F.     Manufacturer Defendants Restrict Manufacturing Capacity Despite a Huge Backlog**

      **1.     Backlogs in Fire Apparatus Orders Increased by 40%**

122.     Demand for Fire Apparatus began rising in the mid-2010s as the economy recovered from the Great Recession, continuing steadily until around 2020. Between 2020 and 2022, fire apparatus orders surged as municipalities received COVID-19 relief funds. Since

---

[69] Master Cooperative Purchasing Agreement, No. 113021-OKC, between Sourcewell and Oshkosh Corp. (April 5, 2022), https://files.sourcewell.org/public/Shared%20Documents/Solicitations/10462/00004210/Contract%20Documents/Oshkosh%20Contract%20113021.pdf.

roughly 2022, annual orders for fire apparatus have stabilized at approximately 5,500 and 6,500 units.

123.    Manufacturer Defendants' production has not kept pace with rising demand. In recent years, order backlogs have grown significantly. For example, REV Group reported a record $3.6 billion backlog in late 2023 – a 41% increase over 2022.[70] The backlog continued to rise in 2024. As of last October, REV Group reported a $4.4 billion backlog for fire and emergency vehicle orders in the United States.[71]

124.    Oshkosh and Rosenbauer have reported similarly large backlogs. Oshkosh's backlog of fire apparatus orders quadrupled between 2019 and 2023, and the company recently reported approximately $4 billion in orders placed but not yet fulfilled.[72] Rosenbauer likewise announced a backlog of roughly $2.67 billion at the end of 2024.[73]

125.    These expanded backlogs have resulted in substantial delivery delays, resulting in operational challenges by fire departments forced to wait for much needed apparatus. In some regions, wait times have more than quadrupled from roughly one year to as long as 4.5 years.[74]

---

[70] Timothy Aeppel, *Fire Truck Boom Highlights Divide in US Manufacturing,* REUTERS (Jan 19, 2024), https://www.reuters.com/markets/us/fire-truck-boom-highlights-divide-us-manufacturing-2024-01-19/.

[71] Rev Group, Inc., SEC Form 10K (Oct. 31, 2024), https://www.sec.gov/Archives/edgar/data/1687221/000095017024135208/revg-20241031.htm.

[72] Baker, Farrell & Kovaleski, *supra* note 21.

[73] Christian Sandherr, *Rosenbauer International AG: Solid Start Into the Year/ Record High Order Backlog,* NUWAYS (May 14, 2025), https://www.nuways-ag.com/company/rosenbauer-international-ag/research/solid-start-into-the-year-record-high-order-backlog ("Q1 sales grew by 16.8% yoy to € 264m (eNuW: € 265m) thanks to the company's strong order backlog of € 2.28bn at the end of FY24.").

[74] American Economic Liberties Project and International Association of Fire Fighters, Letter to Attorney General Pam Bondi, Assistant Attorney General Gail Slater, and FTC Chair Andrew Ferguson, at 2 (May 13, 2025), https://www.economicliberties.us/wp-content/uploads/2025/05/FINAL-2025-5-13-Letter-to-FTC-and-DOJ-re-Firetrucks.pdf.

126. Plaintiff Chelsea's fire department is facing a 3–4-year lead time for an order placed in 2022 to replace a 15-year-old ladder truck that is increasingly expensive to keep in safe working condition. Because surrounding cities face similar delays, Chelsea and its neighboring departments have resorted to lending and borrowing apparatus to each other to meet operational needs. Two years ago, one of Chelsea's reserve engines (pumper) was damaged beyond repair while being used by a neighboring city, placing additional strain on the department and underscoring the urgent need for timely replacement of aging apparatus.

127. Users in a January 2023 online industry forum voiced similar concerns over the long lead times:

   a. A user under the name "Capttomo" reported that "lead times for delivery from date the order is placed to final inspection has gone from 10–12 months to greater than 2 years in many cases and in some cases approaching 3 years."[75] Capttomo had also complained about the huge price increases fire department were experiencing: "$$$$ increase is probably close to 25% of original cost???? I really wonder if these price increases are completely justified. Most of these companies keep posting impressive profits."[76]

---

[75] Capttomo, *Skyrocketing Apparatus Costs and Outrageous Delivery Times,* NYCFire.net Forum (Jan. 4, 2023), https://www.nycfire.net/forums/threads/skyrocketing-apparatus-costs-and-outrageous-delivery-times.75187 (last visited Nov. 20, 2025).

[76] Capttomo, *Skyrocketing Apparatus Costs and Outrageous Delivery Times,* NYCFire.net Forum (Jan. 6, 2023), https://www.nycfire.net/forums/threads/skyrocketing-apparatus-costs-and-outrageous-delivery-times.75187 (last visited Nov. 20, 2025).

b.      Another user under the name "XPFD3" observed that one of the REV Group companies "added 15 months to the delivery time" for a 75' Quint.[77]

c.      Pierce told user "Sfdc111" that there was an estimated 48-month delivery time for "a very cookie cutter" rescue apparatus "without any interior customization."[78]

d.      Yet another described a 435-day waiting period for a single Rosenbauer component, with total wait times reaching up to 3 years.[79]

128.      Mayor Sue Finkam of Carmel, Indiana offered another example. The growth of Carmel required the addition of more fire stations, but she observed that under current conditions, the city could acquire land, design a station, construct the building, hire personnel, and complete training – all before the stations' fire apparatus could be delivered.[80]

129.      The data supports these accounts. In 2022, orders rose to roughly 45 percent above average levels, while order fulfillment fell nearly 10 percent below average levels, as shown in the graph below.

---

[77] XPFD3, *Skyrocketing Apparatus Costs and Outrageous Delivery Times*, NYCFire.net Forum (Jan. 4, 2023), https://www.nycfire.net/forums/threads/skyrocketing-apparatus-costs-and-outrageous-delivery-times.75187 (last visited Nov. 20, 2025).

[78] Sfdc111, Skyrocketing Apparatus Costs and Outrageous Delivery Times, NYCFire.net Forum (Jan. 4, 2023), https://www.nycfire.net/forums/threads/skyrocketing-apparatus-costs-and-outrageous-delivery-times.75187 (last visited Nov. 20, 2025).

[79] CFDMarshal, Skyrocketing Apparatus Costs and Outrageous Delivery Times, NYCFire.net Forum (Jan. 5, 2023), https://www.nycfire.net/forums/threads/skyrocketing-apparatus-costs-and-outrageous-delivery-times.75187 (last visited Nov. 20, 2025).

[80] Mike Baker, *Senators Investigate Private Equity Role in Soaring Fire-Truck Costs*, N.Y. TIMES (Apr. 15, 2025), https://www.nytimes.com/2025/04/15/us/private-equity-fire-trucks-congress-investigation.html.



**Figure 8.** North America Fire Apparatus Trend.[81]

130.     These backlogs cannot be attributed to lingering supply-chain disruptions from

the COVID-19 pandemic or other geopolitical events of the early 2020s. Although supply-chain

issues affected industries nationwide in 2021 and 2022, the Federal Reserve Bank of New York's

Global Supply Chain Pressure Index had returned to baseline by early 2023—reaching its lowest

point on record in May of that year.[82]

---

[81] *FAMA Releases Fire Apparatus Industry Update*, FIRE ENGINEERING (May 30, 2025),
https://www.fireengineering.com/fire-apparatus/fama-releases-fire-apparatus-industry-update.

[82] Diccon Hyatt, *Supply Chains Have Healed From Pandemic Disruptions*, INVESTOPEDIA (June 7, 2023),
https://www.investopedia.com/supply-chains-have-healed-from-pandemic-disruptions-7509263.



**Figure 9.** Global Supply Chain Pressure Index from June 30, 2017 to June 30, 2025.[83]

131. While the rate of order fulfillment has increased again in recent years, that improvement has been far too modest to reduce the serious backlog now facing fire departments that need to replace their aging fleets.

132. In addition to delays for new fire apparatus, delays for replacement part orders have also worsened. Gil Carpenter, fire chief in Benton, Arkansas, explained that before REV Group acquired Ferrara, he could simply call a contact named Charlie whenever he needed a Ferrara replacement part, and the part would arrive the next day. In 2024, however, when one of the department's vehicles required new parts, delivery was delayed for more than ten months, leaving the department without one of its eight trucks for nearly a year.[84]

### 2. Manufacturer Defendants Restrict Manufacturing Capacity

133. Under normal market conditions, a sharp rise in demand would typically cause manufacturers to expand production capacity. Yet Manufacturer Defendants here have failed to

---

[83] *Global Supply Chain Pressure Index (GSCPI)*, FED. RES. BANK OF N.Y. (July 2025), https://www.newyorkfed.org/research/policy/gscpi#/interactive.

[84] Baker, Farrell & Kovaleski, *supra* note 21; *see also REV Group Fire Division Launches New E-Commerce Website for Fire Truck Aftermarket Parts Sales and Service*, FIRE APPARATUS & EMERGENCY EQUIPMENT (July 29, 2019), https://www.fireapparatusmagazine.com/fire-apparatus/rev-group-fire-division-launches-new-ecommerce-website-for-fire-truck-aftermarket-parts-sales-and-se.

expand their capacity. Rather, they "have invested only the bare minimum required to replace depreciated equipment at existing fire apparatus plants."[85]

134.    For instance, REV Group has only recently invested about 1 percent of its revenue in building and equipment maintenance[86] – significantly lower than those in other industries. Former REV investor Alexander Yaggy described this small investment despite its $4 billion backlog as "reflective of an uncompetitive market" given the significant industry-wide backlogs.[87]

135.    Likewise, neither Oshkosh nor Rosenbauer has attempted to capitalize on the surge in demand by increasing capacity or competing for additional market share.

136.    Instead of expanding, some Manufacturer Defendants have reduced their manufacturing footprint by closing existing facilities. In September 2021, when demand was increasing, REV Group shuttered KME's Pennsylvania and Virginia custom fire apparatus facilities,[88] eliminating roughly one-third of its total production capacity.[89]

137.    REV Group touted facility closures to investors as efforts to "streamline operations" rather than a reduction in manufacturing capacity.[90]

---

[85] Musharbash Testimony, at 8, *supra* note 6.

[86] *Id*.

[87] Baker, Farrell & Kovaleski, at 6-7, *supra* note 21.

[88] Chris Reber, *KME Plant to Close in April 2022*, TIMES NEWS ONLINE, (Sept. 11, 2021), https://www.tnonline.com/20210911/kme-plant-to-close-in-april-2022.

[89] Baker, Farrell & Kovaleski, at 7, *supra* note 21.

[90] Musharbash Testimony, at 7, *supra* note 6.



**Figure 10.** REV Group investor presentation.[91]

138.     Although the company announced that orders in progress would be transferred to other REV plants,[92] the closures predictably compounded delays. For instance, Fire Chief Matthew R. Timerman ordered a $1.2 million aerial set to be completed at the Pennsylvania KME plant. As a result of the factory closures, he learned that the truck would instead be built across three different sites introducing substantial additional delays. In the end, Timerman did not receive the fire apparatus until more than four years after the order was placed.[93]

139.     Despite these unprecedented backlogs, the Manufacturer Defendants have expressed little concern that customers might cancel orders or turn to a competitor.

140.     During a 2023 conference call, REV Group CEO Mark Skonieczny explained that cancellations were unlikely because once a municipality allocates funds, the money is "earmarked" and secured by a deposit. "That money is allocated to those units, so we feel good

---

[91] *Id.*

[92] Andrew Corselli, *REV Group Announces Plans to Shift KME Production to Other REV Fire Group Facilities,* Fire APPARATUS & EMERGENCY EQUIPMENT (Sept. 10, 2021), https://www.fireapparatusmagazine.com/fire-apparatus/rev-group-announces-plans-to-shift-kme-production-to-other-rev-fire-group-facilitie.

[93] Baker, Farrell & Kovaleski, at 21, *supra* note 21.

about that,"[94] he said, adding that he did not believe the delays were affecting the company's market share.[95]

141. REV Group's SEC filings further portrayed the backlog as a strategic advantage that would benefit investors:

> [C]ertain of our businesses carry a relatively long-duration backlog which enables strong visibility into future net sales …. Where this backlog visibility exists, we are able to more effectively plan and predict our sales and production activity.[96]

142. REV Group president Mike Virnig testified at a 2025 Senate hearing that despite plant closures and skyrocketing backlogs, "everything we do in the fire division is to build more trucks" and "we agree that backlogs are too long." Virnig offered a pretextual explanation that the backlog resulted from an increase in orders in 2022 and 2023. Pierce's VP of Sales, Dan Meyer, likewise testified that the growing lead time is "bad for [Pierce's] business."[97]

143. But Manufacturer Defendants had been boasting about their growing backlogs for years – well before the 2022-2023 increase in orders. In 2018, for example, REV Group CEO

---

[94] *Id.*

[95] Eman Abu-Khaled, *REV Group Takes Steps to Normalcy After Supply-Chain Setbacks*, TRAILER BODY BUILDERS (Mar. 22, 2023), https://www.trailer-bodybuilders.com/truck-bodies/article/21262503/rev-group-takes-steps-to-normalcy-after-supply-chain-setbacks.

[96] REV Group, Inc., Annual Report 2023, at 11 (Dec. 13, 2023) https://investors.revgroup.com/~/media/Files/R/Rev-IR/Annual%20Reports/rev-annual-report-2023.pdf.

[97] *Sounding the Alarm: America's Fire Apparatus Crisis: Hearing Before the Subcomm. on Disaster Mgmt., Dist. of Columbia & Census of the S. Comm on Homeland Sec. & Gov't Affs.*, 119th Cong. (Sept. 10, 2025), https://www.hsgac.senate.gov/subcommittees/dmdcc/hearings/sounding-the-alarm-americas-fire-apparatus-crisis/ (last visited Nov. 25, 2025).

Tim Sullivan stated, "We like backlog, we love backlog. We like long backlogs that are out for months."[98]  In 2019, Sullivan again cited "a record backlog level" as "an encouraging sign."[99]

144.     Similarly, in January 2020, Oshkosh boasted of "strong order growth and an all-time high backlog," describing its Fire & Emergency division as having posted "a solid quarter."[100] And in a 2025 Investor Day presentation, Oshkosh announced that it expected to further increase profit margins to record levels through "pricing realization from backlog."[101]

**Figure 11.** Revenue growth supported by strong backlog.[102]

[98] REV Group Inc., Q2 Earnings Call Transcript (June 7, 2018), SEEKING ALPHA, https://seekingalpha.com/article/4180201-rev-group-revg-ceo-tim-sullivan-on-q2-2018-resultsearnings-call-transcript.

[99] REV Group, Inc. Q1 Earnings Call Transcript (Mar. 7, 2019), SEEKING ALPHA, https://seekingalpha.com/article/4247103-rev-group-revg-ceo-tim-sullivan-on-q1-2019-results-earnings-call-transcript.

[100] Oshkosh Corp., Q1 Earnings Call Transcript (Mar. 5, 2020), SEEKING ALPHA, https://seekingalpha.com/article/4330123-rev-group-inc-revg-ceo-timothy-sullivan-on-q1-2020-results-earnings-call-transcript.

[101] Oshkosh Corp., Investor Day (PDF) (June 5, 2025), at 87, https://online.flippingbook.com/view/29819025/ (last visited Nov. 18, 2025).

[102] Id.

145. In short, instead of meeting demand, Manufacturer Defendants elected to restrict supply. In a properly functioning competitive market, rational companies would boost production in response to rising demand, investing in facilities, expanding manufacturing capacities, meeting customer needs, and competing to outperform rivals. But in the fire apparatus market, the opposite occurred. The largest manufacturers have closed plant factories and restricted supply despite growing demand and unprecedented backlogs.

### G. Defendants' Conspiracy Caused Significant Price Hikes and a Dangerous Supply Shortage of Fire Apparatus

#### 1. The Price of Fire Apparatus Doubled During the Class Period

146. Predictably, as demand increased while supply remained flat or declined, the cost of Fire Apparatus rose sharply throughout the Class Period. In the mid-2010s, a standard pumper typically cost between $400,000 and $500,000.[103] In recent years, however, the average price of a pumper has increased to approximately $1 million.[104]

147. Ladder trucks have seen similar increases. The cost of a typical ladder truck has ballooned from $750,000 to $900,000 in the mid-2010s to upward of $2 million today.[105] As one industry leader explained, the industry has "reached a new level of price psychology. Today, relationships start at a half million dollars, and 10 years ago that was a remote concept."[106]

---

[103] Chris Godfrey, An Evaluation Of Fire Apparatus Usage And Operating Cost For Green Township Fire & Ems (PDF), at 9 (Aug. 2, 2013), http://www.ohiofirechiefs.com/aws/OFCA/asset_manager/get_file/77188.

[104] Musharbash Testimony, *supra* note 6.

[105] Chris Godfrey, An Evaluation Of Fire Apparatus Usage And Operating Cost For Green Township Fire & Ems, at 9 (Aug. 2, 2013), http://www.ohiofirechiefs.com/aws/OFCA/asset_manager/get_file/77188.

[106] Chris Mc Loone, *Fire Industry Outlook: 10 Years After the Great Recession*, FIRE APPARATUS & EMERGENCY EQUIPMENT (Dec. 1, 2018), https://www.fireapparatusmagazine.com/fire-apparatus/fire-industry-outlook-10-years-after-the-great-recession.

148. Customers cannot seek a better deal by turning to the competition. As one industry executive observed, "[t]here are now times when all vendors at a bid table, each with a 'different' product, are all owned and managed by the same parent company. How is that competitive for the purchaser?"[107] Fire departments nationwide therefore have little choice but to accept the prices charged by Manufacturer Defendants.

### 2. Manufacturer Defendants Implemented "Floating Prices" to Further Increase Prices

149. In addition to raising base prices, REV Group, Oshkosh, and Rosenbauer have taken advantage of the industry's substantial backlog by imposing "floating prices." Citing the purported difficulty of forecasting material costs over lengthy production timelines, Manufacturer Defendants use contractual provisions that allow them to increase the final price of an apparatus after production has begun. Production delays often extend these timelines, enabling manufacturers to impose substantial price increases years after a fire department places its initial order.[108] Rosenbauer's president, Mark Fusco, has acknowledged that the company applies "surcharges that might occur during the build times."[109]

150. One Massachusetts fire department experienced this firsthand. After ordering a fire apparatus in 2022 and later adding two additional apparatus in 2023, the manufacturer increased the price of the 2022 apparatus by $150,000 to match the cost of the newly ordered units. The manufacturer threatened to withhold delivery of the 2022 apparatus unless the

---

[107] Musharbash, *supra* note 19.

[108] Press Release, Sen. Jim Banks, Sens. Banks, Warren Probe Harms of Private Equity in Fire Truck Manufacturing (Apr. 15, 2025), https://www.banks.senate.gov/press-releases/sens-banks-warren-probe-harms-of-private-equity-in-fire-truck-manufacturing.

[109] Ed Ballam, *2022 Was Good for Fire Service Industry; 2023 Is Uncertain,* FIRE APPARATUS & EMERGENCY EQUIPMENT (Dec. 20, 2022), https://www.fireapparatusmagazine.com/fire-apparatus/2022-was-good-for-fire-service-industry-2023-is-uncertain.

department accepted the increase. The fire chief explained that the department felt "compelled to pay this increase out of fear that the process to get apparatus would take too long and we would not be able to provide service to our community."[110]

151. Other departments have faced similar treatment. A fire department in Indiana saw a price increase of more than $100,000 for the same pumper after a seven-month production delay.[111] Likewise, the Loveland Fire Rescue Authority in Colorado incurred a $29,000 surcharge on a pending order.[112]

### 3. Manufacturer Defendants Reaped Substantial Profits as a Result of the Conspiracy

152. Defendants have reaped substantial profits from the unprecedented price increases described above. With a few exceptions during the pandemic years, overall revenues for fire apparatus manufacturers in the U.S., including Manufacturer Defendants, have increased significantly since 2015.

---

[110] Press Release, Sen. Jim Banks, Sens. Banks, Warren Probe Harms of Private Equity in Fire Truck Manufacturing (Apr. 15, 2025), https://www.banks.senate.gov/press-releases/sens-banks-warren-probe-harms-of-private-equity-in-fire-truck-manufacturing.

[111] *Id.*

[112] *"Floating" Prices & Lengthy Delivery Times for Fire Apparatus: CSFC Members' Perspective*, at 1 (Aug. 25, 2022), https://static1.squarespace.com/static/5ea64a6b9614427b0ff93e6d/t/63080a517f782438bdd6f98e/1661471313934/Floating+Prices+Lenghty+Delivery+Time+for+Fire+Apparatus+Aug+25+2022%5B42%5D.pdf .



**Figure 12.** Fire Apparatus Manufacturing Revenue in the US (2011 – 2024).[113]

153. In July 2021, REV Group announced that it had "exceeded consensus earnings estimates for five consecutive quarters."[114] In 2024, REV Group reported profit margins had risen to what the company described as an "exceptional 8.9 percent" for the division that includes fire apparatus.[115] REV Group's most recent earnings report boasted a 65% jump in earnings per share in Q3 2025 that were "well above forecasts."[116]

---

[113] Oliwier Samorajski, *Fire Truck Manufacturing in the US – Market Research Report (2015-2030)*, IBIS WORLD (Apr. 2025), https://www.ibisworld.com/united-states/industry/fire-truck-manufacturing/5645 (last visited Nov. 15, 2025).

[114] REV Group, Inc., Rev Group, Inc. Presentation (PDF), at 4 (July 2021), https://investors.revgroup.com/~/media/Files/R/Rev-IR/reports-and-presentations/rev-group-presentation-july-2021.pdf (last visited Nov. 21, 2025).

[115] Baker, Farrell & Kovaleski, *supra* note 21.

[116] *Rev Group Posts 65% Profit Jump in Q3*, THE MOTLEY FOOL (SEPT. 3, 2025), https://www.fool.com/data-news/2025/09/03/rev-group-posts-65-profit-jump-in-q3/.

154. Likewise, in June 2025, Oshkosh reported that its adjusted operating margins increased from 4.8% to 10.5% between 2022 and 2024, thereby meeting its "key 2022 Investor Day targets one year early."[117]



**Figure 13.** Oshkosh Financial Performance, 2022 to 2024.[118]

155. Oshkosh projects that its adjusted operating margins will rise to 12-14 percent by 2028, with revenue of $13-14 billion.[119] The company stated that this revenue growth will be "supported by strong backlog" and further price increases.[120]

156. Rosenbauer reported similar record high revenues with a 22.7% year-on-year increase in revenue for 2024.[121]

---

[117] Oshkosh Corp., Investor Day (Presentation Slides), at 83 (June 5, 2025), https://online.flippingbook.com/view/29819025/3.

[118] *Id.*

[119] *Id*. at 86.

[120] *Id*. at 87.

[121] Iain Hoey, *Rosenbauer Achieves €1.3 Billion Revenue and Reduces Net Debt in 2024*, Int'l Fire & Safety J. (Apr. 24, 2025), https://internationalfireandsafetyjournal.com/rosenbauer-achieves-e1-3-billion-revenue-and-reduces-net-debt-in-2024/.

## V. ANTICOMPETITIVE EFFECTS

### A. Plaintiffs Paid Artificially Inflated Prices for Fire Apparatus

157. Today, the average cost of a pumper is approximately $1 million, and the average cost of an aerial ladder truck is approximately $2 million. Absent Defendants' conduct, the expected average costs would be approximately $680,000 for a pumper and $1.2 million for an aerial ladder truck, adjusted for general inflation from 2015 to 2025.[122]

158. Municipalities nationwide are therefore paying roughly 47 percent (or $320,000) more for pumpers and 66 percent (or $800,000) more for aerial ladder trucks than they would have based on inflation alone.

159. Approximately 5,000 new fire apparatus are sold in the United States each year. About 75% are pumpers.[123] Based on these numbers, Plaintiff and other Class members have paid an estimated $56.25 billion for new fire apparatus[124]—an overcharge of approximately $19.8 billion more than what would be expected based on inflation alone.[125]

160. A fire chief in Ann Arbor, Michigan noted that the price of fire apparatus has become "bonkers," describing what appears to be "almost a monopoly market." The city's next fire apparatus is projected to cost $2.4 million and take four years to arrive.

---

[122] Calculated assuming a pumper cost $500,000 and a ladder truck cost $900,000 in 2015.

[123] Alan M. Petrillo, *What's the Right Size Pump for Your Apparatus and How Does It Affect the Design?,* FIRE APPARATUS & EMERGENCY EQUIPMENT (Sept. 27, 2023), https://www.fireapparatusmagazine.com/fire-apparatus/pumpers/whats-the-right-size-pump-foryour-apparatus-and-how-does-it-affect-the-design.

[124] Calculated as ((3,750 pumper trucks per year * 9 years *$1 million) + (1,250 ladder trucks per year * 9 years * $2 million)).

[125] Cost based on inflation alone ($36.45 billion) calculated as ((3,750 pumper trucks per year * 9 years *$680,000) + (1,250 ladder trucks per year * 9 years * $1.2 million)).

161. Even accounting for supply-chain disruptions and labor-shortage challenges affecting the fire apparatus market, these price increases far exceed what would be expected in a competitive market.

**B.      Plaintiff and Class Members Cannot Access Essential Fire Apparatus, Jeopardizing Public Safety**

162. As fire apparatus age, they become increasingly prone to serious and frequent mechanical failures, resulting in costly repairs and extended downtime. Once they reach the end of their useful life, fire apparatus must be replaced to ensure safe operations.

163. FAMA 1900 recommends that after 15 years of front-line service, Fire Apparatus be relegated to reserve status and undergo a detailed inspection and evaluation to determine if any refurbishment or upgrades are necessary. Once in reserve status, Fire Apparatus should be used only as a back-up. Once the apparatus reaches 25-years old, the NFPA recommends that the apparatus be completely removed from service.[126]

164. Escalating prices and prolonged delivery timelines have made it difficult for municipalities to replace aging fleets. As a result, many departments continue to operate apparatuses that have exceeded their recommended service life while waiting for years for newly purchased units to be manufactured and delivered.

165. The president of the Kansas State Association of Fire Chiefs, Chad A. Russell, describes the impact of the fire apparatus shortage crisis caused by Defendants' conduct as follows:

> This is not just a matter of dollars and cents—it is a public safety issue. When rigs are sidelined or unavailable, our ability to respond

---

[126] Murray, Joseph, *Fire Chief Considerations: Making the Case for Apparatus Replacement*, FIRE APPARATUS MAGAZINE (Jan. 22, 2015), https://www.fireapparatusmagazine.com/fire-apparatus/fire-chief-considerations-making-the-case-for-apparatus-replacement/.

is compromised. Mutual aid systems strain, response times increase, and the safety of our citizens and firefighters is jeopardized.[127]

166. There are countless examples of fire departments operating with aging and insufficient fleets, resulting in unnecessary risks to public safety.

167. The Los Angeles fire department aims to keep 90% of its fleet ready for deployment, but recently it has managed only around 78% as older apparatus require frequent repairs.[128] In January 2025, two large fires in Los Angeles burned for days, resulting in 29 casualties. At the time the fires ignited, more than 100 of the Los Angeles Fire Department's 183 fire apparatus were out of service.[129] LAFD Fire Chief Kristin Crowley confirmed that the department's limited operational fleet hindered its ability to respond effectively.[130] Additional available apparatus might have mitigated the resulting devastation, which included $350 million in damage to public facilities and the widespread loss of livelihoods.[131]

168. In Atlanta, auditors discovered that over a third of the city's aging firefighting vehicles were out of service.[132]

---

[127] *Sounding the Alarm: America's Fire Apparatus Crisis: Hearing Before the Subcomm. on Disaster Mgmt, D.C. and Census of the S. Comm. on Homeland Sec. & Gov't Affs*, 119th Cong. (2025) (statement of Dennis L. Rubin, Fire Chief, Kansas City Kansas Fire Dep't). at 11, https://www.hsgac.senate.gov/wp-content/uploads/Rubin-Testimony.pdf (last visited Nov. 19, 2025).

[128] Baker, Farrell & Kovaleski, *supra* note 21.

[129] American Economic Liberties Project and International Association of Fire Fighters, Letter to Attorney General Pam Bondi, Assistant Attorney General Gail Slater, and FTC Chair Andrew Ferguson, at 3 (May 13, 2025), https://www.economicliberties.us/wp-content/uploads/2025/05/FINAL-2025-5-13-Letter-to-FTC-and-DOJ-re-Firetrucks.pdf.

[130] Baker, Farrell & Kovaleski, *supra* note 21.

[131] American Economic Liberties Project and International Association of Fire Fighters, Letter to Attorney General Pam Bondi, Assistant Attorney General Gail Slater, and FTC Chair Andrew Ferguson, at 3 (May 13, 2025), https://www.economicliberties.us/wp-content/uploads/2025/05/FINAL-2025-5-13-Letter-to-FTC-and-DOJ-re-Firetrucks.pdf.

[132] Baker, Farrell & Kovaleski, *supra* note 21.

169.    Fire departments in Houston and Seattle face similar challenges,[133] as do smaller municipalities in states such as Connecticut, Illinois, Michigan, New York, New Jersey, Pennsylvania, Texas, Kansas, and West Virginia.[134]

170.    For instance, in 2024, the city of Evanston, Illinois, had to negotiate with a regional Pierce Manufacturing dealer to purchase a demonstration model just to shorten the delivery time of a $2.3 million truck to roughly 12–14 months.[135] The new vehicle was needed to replace an 18-year-old reserve truck with serious mechanical issues that would have cost about $300,000 to repair.[136]

171.    Similarly, the fire chief in Watertown, New York, explained that his department was so short on equipment that it resorted to buying a 20-year-old ladder truck from another city.[137]

172.    The fire chief of Camden, New Jersey, Jesse M. Flax, said that the rising prices and long lead times for fire apparatus were "creating greater risk for the public and firefighters."[138]

---

[133] Christy Grimes, *Houston Fire Department Navigating Supply Chain Hurdles with Fleet Replacements,* GOV'T FLEET (Sept. 11, 2023), https://www.governmentfleet.com/10206016/houston-fire-department-to-replace-aging-vehicles; David Kroman, *Seattle Firetruck Fleet Deteriorating Faster than Repairs Can Keep Up*, SEATTLE TIMES (Apr. 1, 2024), https://www.seattletimes.com/seattle-news/politics/seattle-firetruck-fleet-deteriorating-faster-than-repairs-can-keep-up.

[134] Marvin Hurst, *North Texas Fire Department in Crisis Needs Financial Windfall To Overcome Equipment Challenges*, CBS NEWS (Jan. 26, 2025), https://www.cbsnews.com/texas/news/north-texas-fire-department-needs-financial-windfall-to-overcome-equipment-challenges/; Allen Clayton, *City of Clarksburg Approves $3.1 Million to Purchase New Fire Trucks*, 12WBOY (Feb. 29, 2024), https://www.wboy.com/news/harrison/city-of-clarksburg-approves-3-1-million-to-purchase-new-fire-trucks/; Musharbash, *supra* note 19; Baker, Farrell & Kovaleski, *supra* note 21.

[135] Bill Smith, *Council OK's Fire Truck Buy*, EVANSTON NOW (Mar. 26, 2024), https://evanstonnow.com/council-oks-fire-truck-buy.

[136] *Id*.

[137] Baker, Farrell & Kovaleski, *supra* note 21.

[138] *Id*.

173. During a 2024 house fire in Camden, crews were slowed by mechanical problems with a responding truck, and a resident died in the blaze.[139]

174. In Castle Rock, Colorado, firefighters were forced to respond in Type 3 brush trucks—rather than more suitable vehicles—due to a four-year delivery delay for a new apparatus.[140]

**C.    Plaintiff and Class Members Have Diverted Funds from Other Essential Needs to Pay the Artificially Inflated Prices of Fire Apparatus**

175. The increasing cost of fire apparatus has placed significant strain on municipality budgets, leaving them with less resources to fund other needs.[141]

176. For example, the cities of Spokane, Washington and Mills, Wyoming, have had to cancel essential training and even lay off firefighters.[142]

## VI.    ANTITRUST INJURY & DAMAGES

177. Defendants' anticompetitive conduct has had the following effects, among others:

   a.    Price competition for fire apparatus has been restrained or eliminated;

   b.    Prices for fire apparatus sold by the Manufacturer Defendants and their divisions, subsidiaries, affiliates, or co-conspirators, in turn, have been raised, fixed, maintained, or stabilized at artificially high, noncompetitive levels throughout the United States;

---

[139] *Id.*

[140] Isabelle Crow, *IAFF Spotlight Apparatus Crisis and Its Impact*, FIRE & SAFETY J. (June 20, 2025) https://fireandsafetyjournalamericas.com/iaff-spotlight-apparatus-crisis-and-its-impact.

[141] Musharbash, *supra* note 19.

[142] American Economic Liberties Project and International Association of Fire Fighters, Letter to Attorney General Pam Bondi, Assistant Attorney General Gail Slater, and FTC Chair Andrew Ferguson, at 2 (May 13, 2025), https://www.economicliberties.us/wp-content/uploads/2025/05/FINAL-2025-5-13-Letter-to-FTC-and-DOJ-re-Firetrucks.pdf.

c.    purchasers of fire apparatus have been deprived of free and open competition; and

d.    purchasers of fire apparatus have paid artificially inflated prices.

178.    The ultimate purpose of Defendants' and their co-conspirators' conduct is to raise, fix, maintain, or stabilize the price of fire apparatus and, as a direct and foreseeable result, Plaintiff and the Class have paid supra-competitive prices for fire apparatus during the Class Period.

179.    By reason of the alleged violations of the antitrust laws, Plaintiff and Class Members have sustained injury, having paid higher prices for Fire Trucks than they would have paid in the absence of Defendants' illegal contract, combination, or conspiracy, and as a result, they have suffered damages.

180.    This is an antitrust injury of the type that the antitrust laws were meant to punish and prevent.

## VII.    CLASS ACTION ALLEGATIONS

181.    Plaintiff brings this action on behalf of itself and as a class action pursuant to Federal Rules of Civil Procedure 23(a), (b)(2) and (b)(3), seeking damages and injunctive relief on behalf of the following class:

> All entities, including local or municipal government entities, distributors, and buying groups, that directly purchased fire apparatus from Manufacturer Defendants in the United States from January 1, 2016 through and until the anticompetitive effects of Defendants' unlawful conduct cease (the "Class Period").

182.    Excluded from the class are Defendants, their parent companies, subsidiaries, and affiliates, any co-conspirators, Defendants' officers, directors, management, employees,

52

subsidiaries, affiliates, or agents, all state and federal governmental agencies, and any judges or justices assigned to hear any aspect of this action.

183. **Numerosity**. Plaintiff does not know the exact number of Class members because such information is in the exclusive control of Defendants and co-conspirators. Due to the nature of the trade and commerce involved, there are most likely hundreds of thousands of Class members, geographically dispersed throughout the United States, such that joinder of all Class members is impracticable.

184. **Typicality**. Plaintiff's claims are typical of the claims of the Class in that it and Class members all purchased Fire Apparatus Equipment at artificially inflated prices. All Class members were damaged by the same wrongful conduct of Defendants and their co-conspirators, and the relief sought is common to the Class.

185. **Commonality**. Questions of law or fact that arise from Defendants' anticompetitive conduct are common to the Class, including, but not limited to, the following:

    a)    Whether Defendants and co-conspirators engaged in a contract, combination, and/or conspiracy to fix, raise maintain, or stabilize prices of Fire Apparatus Equipment sold in the United States;

    b)    Whether Defendants' and co-conspirators' conduct caused prices of Fire Apparatus Equipment sold in the United States to be sold at artificially high and supracompetitive levels;

    c)    Whether Plaintiff and the other Class members were injured by Defendants' and co-conspirators' conduct and, if so, the appropriate class-wide measure of damages for Class members; and

d)	The scope of any injunctive relief to which Plaintiff and other Class members are entitled.

186.	**Predominance**. These and other questions of law and fact are common to the Class and predominate over any questions affecting only individual Class members. In addition, Defendants have acted on grounds generally applicable to the Class, thereby making final injunctive relief appropriate with respect to the Class as a whole.

187.	**Adequacy**. Plaintiff will fairly and adequately represent the interests of the Class and have no known conflict with any other members of the Class. Further, Plaintiff has retained competent counsel experienced in antitrust, class action, and other complex litigation.

188.	**Superiority**. A class action is superior to the alternative of individual actions for the fair and efficient adjudication of this controversy. There will be no material difficulty in the management of this action as a class action. Prosecution as a class action will eliminate the possibility of repetitive litigation, and thus costly and duplicative efforts and expenses. In the same vein, proceeding as a class action has the benefit of providing injured persons with a method of obtaining relief for their claims that might not be economically feasible. In addition, the prosecution of separate actions would create the risk of inconsistent or varying adjudications, establishing incompatible standards of conduct for Defendants.

## VIII.	RELEVANT MARKET

### A.	Relevant Product and Geographic Market

189.	To the extent the definition of a relevant product market is legally relevant in this action, the relevant product market is fire apparatus.

54

190.     As described in Paragraphs 39 through 48 above, the market for fire apparatus includes the categories and types of fire apparatus and ARFF vehicles recognized by NFPA 1900, as well as the seven types of fire engines recognized by the NWCG.

191.     To the extent a definition of a relevant geographic market is legally relevant in this action, the geographic market is the United States. Defendants operate across the United States and have increased prices for fire apparatus nationwide.

**B.       Manufacturer Defendants Share Market Power in the Relevant Market**

192.     The fire apparatus market exhibits hallmark characteristics of markets prone to cartel behavior, including: (1) high market concentration; (2) high barriers to entry; and (3) inelastic demand.

### 1.       High Market Concentration

193.     A highly concentrated market is more susceptible to collusion and other anticompetitive practices than less concentrated markets.

194.     The U.S. fire apparatus manufacturing market is highly concentrated, with the Manufacturer Defendants dominating both production and sales. The REV Group brands generate roughly $1 billion in annual U.S. fire apparatus revenue, Oshkosh and Pierce about $750 million, and Rosenbauer approximately $307 million. Together, these firms control an estimated 70–80% of the national market.[143]

195.     Manufacturer Defendants have expanded their scale and product offerings through mergers, acquisitions, and the absorption of regional competitors. These transactions have increased barriers to entry, reduced the number of independent producers, and further centralized production capacity and distribution networks in the hands of a few firms.

---

[143] Baker, Farrell & Kovaleski, *supra* note 21.

Case 1:26-cv-00573-WCG     Filed 12/02/25     Page 58 of 68     Document 1

196.    As a result, the U.S. fire apparatus market has become exceptionally concentrated, heightening the risk of collusion and other anticompetitive behavior. With only a few large companies controlling the vast majority of sales, they can more easily monitor one another's conduct, align pricing, allocate territories, and maintain supracompetitive prices over time.

**2.    High Barriers to Entry**

197.    Under basic economic principles, supracompetitive pricing ordinarily would attract new entrants seeking to capitalize on elevated margins. However, when significant barriers to entry exist, new competitors are far less likely to enter. The fire apparatus market is characterized by exceptionally high barriers to entry that insulate incumbent manufacturers from competitive pressure.

198.    Manufacturers of fire apparatus must comply with a complex set of industry standards and a wide-range of federal, state, and local regulations governing safety, emissions, and performance. These requirements demand substantial engineering, testing, certification capabilities, and ongoing compliance infrastructure. Established manufacturers have already invested heavily in these systems, giving them a significant advantage over would-be entrants.

199.    Fire apparatus production requires significant capital investment in engineering, manufacturing facilities, specialized equipment, and a highly trained labor force. Developing the capacity to design and build heavy, complex, mission-critical vehicles requires expertise and financial resources that few potential entrants possess. Entrants would face high average costs and years of investment before reaching competitive scale.

200.    Fire apparatus are often customized for the precise operational needs of individual fire departments. The United States has roughly 30,000 fire departments operating approximately 52,000 stations nationwide, each with specific requirements and procurement processes. Meeting this highly fragmented, specification-driven demand necessitates deep industry knowledge,

56

extensive engineering capabilities, and robust customer-support infrastructure. New entrants lack the institutional experience and relationships needed to compete effectively for these highly customized orders.

201. Manufacturer Defendants have also strengthened barriers to entry by securing exclusive arrangements with suppliers of essential components—including steel and other inputs—and with key government procurement platforms. Such exclusivity limits new manufacturers' access to critical materials and purchasing channels, further impeding entry. In addition, REV Group's sale of Spartan chassis to smaller manufacturers affords it leverage and influence over potential competitors who depend on its chassis as an essential input.

202. These and other entry barriers prevent new manufacturers from successfully entering or expanding within the fire apparatus market. As a result, Manufacturer Defendants' dominant market positions remain protected from meaningful competitive threats.

### 3. Demand for Fire Apparatus is Inelastic

203. Demand in the fire apparatus market is highly inelastic, a condition that economic theory recognizes as making industries especially susceptible to cartel or other anticompetitive behavior. When demand is inelastic, increases in price do not meaningfully reduce the quantity purchased, allowing firms engaged in collusion to raise prices without risking significant loss of sales.

204. Demand for fire apparatus is inelastic because they are indispensable for providing critical firefighting services. Municipalities and government agencies must procure new equipment and replacement parts—typically every 10 to 15 years—to protect lives and property. As Senator Andy Kim observed, this is "not equipment that small towns or even big cities can forego."

57

205. As a result, buyers like Plaintiff are particularly vulnerable to collusion. Defendants can raise prices with little fear of substitution or reduced demand.

## IX. FRAUDULENT CONCEALMENT AND TOLLING

206. Throughout the Class Period, Defendants affirmatively and fraudulently concealed their unlawful and anticompetitive conduct from Plaintiff and class members. Any applicable statute of limitations has been tolled and suspended by Defendants' knowing and active concealment of their unlawful conduct.

207. Plaintiff and class members had no actual or constructive knowledge of Defendants' anticompetitive scheme. And Plaintiff and the Class did not discover, nor could they have discovered, through the exercise of reasonable diligence, the existence of the conduct alleged until shortly before filing this Complaint.

208. Further, the very nature of Defendants' conduct was secret and self-concealing inasmuch as Defendants hid their conduct through multiple methods, including confidential meetings and secret communications, and the exchange of competitively sensitive information through FAMA's "members' only" data portal, which is intentionally concealed from non-members, such as Plaintiff and class members, the general public, and even FAMA members who do not participate in the data exchange.

209. Defendants further engaged in secret communications through members-only bi-annual FAMA meetings, where Defendants had the opportunity to meet in-person and share information privately to avoid the creation of written records.

210. Because the public had no access to either the FAMA data or the FAMA members-only meetings, there was no reason for Plaintiff to suspect that Defendants were engaged in an unlawful anticompetitive scheme.

58

211. Defendants' anticompetitive conspiracy, by its very nature, was self-concealing. Defendants' conduct was revealed only through the investigative reporting of Basel Musharbash,[144] journalists with the New York Times,[145] and inquiries from the U.S. Senate.[146]

212. Furthermore, Defendants openly represented that they comply with the federal antitrust laws that prohibit the very conduct alleged in this Complaint.

213. For example, REV Group states that:

> We are also subject to federal, state and foreign consumer protection and unfair trade practice laws and regulations . . . . In addition, certain laws and regulations affect other areas of our operations, including, . . . anti-competitive conduct . . . . We have instituted various and comprehensive policies and procedures designed to ensure compliance. . . .[147]

214. Similarly, FAMA's Code of Ethics requires all FAMA members, including Manufacturer Defendants, to:

> Be aware of and obey all anti-trust trade regulation laws which prohibit actions that restrain competition. As an example, you may not cooperate with competitors to fix or stabilize prices, divide up clients or markets, boycott competitors, or discuss the possibility of these activities with competitors.[148]

215. No information in the public domain was available to Plaintiff and class members prior to these events that would suggest Defendants were conspiring with each other.

---

[144] Musharbash, *supra* note 19.

[145] Baker, Farrell & Kovaleski, *supra* note 21.

[146] Press Release, Sen. Jim Banks, Sens. Banks, Warren Probe Harms of Private Equity in Fire Truck Manufacturing (Apr. 15, 2025), https://www.banks.senate.gov/news/press-releases/sensbanks-warren-probe-harms-of-private-equity-in-fire-truck-manufacturing/; Press Release, Sen. Josh Hawley, Hawley, Kim Demand Answers from Major Companies after Backlog, Soaring Prices Hamper Fire Department Readiness (Apr. 3, 2025), https://www.hawley.senate.gov/hawley-kim-demand-answers-from-major-companies-afterbacklog-soaring-prices-hamper-fire-department-readiness/.

[147] REV Group, Inc., Annual Report (Form 10-K) (2023), https://investors.revgroup.com/~/media/Files/R/Rev-IR/Annual%20Reports/rev-annual-report-2023.pdf.

[148] FAMA, Code of Ethics, https://www.fama.org/code-of-ethics/ (last visited Nov. 19, 2025).

Accordingly, Plaintiff reasonably considered the fire apparatus industry to be competitive, and a reasonable person under the circumstances would not have been alerted to begin to investigate the legitimacy of Manufacturer Defendants' fire apparatus prices.

## X.      CONTINUING VIOLATIONS

216.     A continuing violation restarts the statute of limitations each time Defendants commit an overt act. Throughout the Class Period, Defendants continued to make sales of fire apparatus whose prices were fixed as a result of Defendants' continually renewed and adjusted price-fixing and information exchange agreement. Defendants needed to continually renew and adjust their price fixing and information exchange agreement to account for ever-fluctuating economic and market conditions.

217.     A continuing violation restarts the statute of limitations each time Defendants commit an overt act. Throughout the Class Period, Defendants repeatedly fixed prices, exchanged confidential information, and sold fire apparatus at unlawfully inflated, supracompetitive prices. To maintain the effectiveness of their conspiracy, Defendants continually renewed and adjusted their price-fixing and information-exchange agreement to account for changing economic and market conditions.

218.     These overt acts were new and independent acts that perpetuated and adapted the unlawful scheme; they were not merely reaffirmations of prior conduct. By continually renewing and refining their agreement, Defendants inflicted ongoing and cumulative injury on Plaintiff and Class Members.

219.     Under the continuing violation doctrine, a price-fixing conspiracy that results in a series of unlawfully high-priced sales triggers a new statutory period with each sale. Accordingly, every supercompetitive priced sale of a fire apparatus to Plaintiff or Class Members

constituted a new cause of action and restarted the statute of limitations, regardless of Plaintiff's knowledge of earlier violations.

## XI. CAUSES OF ACTION

### COUNT 1

**Conspiracy in Restraint of Trade in Violation of
Section 1 of the Sherman Act, 15 U.S.C. §§ 1
(Against All Defendants)**

220. Plaintiff repeats the foregoing allegations as if fully set forth herein.

221. Beginning at a time currently unknown to Plaintiff, but at least as early as January 1, 2016, and continuing through to the present, Defendants entered into and engaged in a continuing contract, combination or conspiracy to unreasonably restrain trade or commerce in violation of Section 1 of the Sherman Act.

222. The contract, combination or conspiracy consisted of an agreement among Defendants to (1) fix, raise, stabilize, or maintain the prices they charged for fire apparatus in the United States at artificially high levels, (2) restrict the manufacturing capacity and output of fire apparatus sold in the United States; and (3) exchange competitively sensitive information, causing anticompetitive effects without sufficient procompetitive justifications.

223. Defendants' anticompetitive conduct had the following effects, among others:

- Competition among Defendants has been restrained or eliminated with respect to fire apparatus;

- The prices of fire apparatus have been fixed, stabilized, maintained or increased at artificially high levels; and

- Plaintiff and Class members have been deprived of the benefits of free and open competition between and among Defendants.

224. This conduct is unlawful under the *per se* standard. Defendants' conduct is also unlawful under either a quick look or rule of reason analysis because the agreement is

anticompetitive with no valid procompetitive justifications. Moreover, even if there were valid procompetitive justifications, such justifications could have been reasonably achieved through less restrictive means of competition.

225.    Defendants' anticompetitive acts had a direct, substantial, and foreseeable effect on interstate commerce by raising and fixing prices for fire apparatus throughout the United States.

226.    As a direct and proximate result of Defendants' unlawful conduct, Plaintiffs and class members were injured in their business or property and will continue to be injured by paying artificially inflated prices for fire apparatus they would not otherwise have paid absent Defendants' conduct.

227.    Plaintiff and Class members are entitled to treble damages, attorneys' fees and costs, and an injunction against Defendants to end the alleged ongoing violations.

## COUNT 2

**Restraint of Trade in Violation of**
**Section 7 of the Clayton Act, 15 U.S.C. § 18**
**(Against Defendants Oshkosh, Pierce, REV Group,**
**E-One, Ferrara, KME, Spartan ER, Smeal, and Ladder Tower)**

228.    Plaintiff repeats the foregoing allegations as if fully set forth herein.

229.    Defendants unlawful conduct, as described above, substantially lessened competition in the market for fire apparatus in the United States.

230.    As a direct and proximate result of Defendants' unlawful conduct, Plaintiff and class members were injured in their business or property.

231.    This offense is likely to continue unless injunctive relief is granted.

232. Plaintiff and members of the Class are entitled to treble damages and an injunction against Defendants, preventing and restraining the violations alleged in this Complaint.

## COUNT 3

### Aiding and Abetting Violations of Section 1 of
### the Sherman Act, 15 U.S.C. § 1
### (Against FAMA)

233. Plaintiff repeats the foregoing allegations as if fully set forth herein.

234. Alternatively, FAMA created, and continues to operate its members-only data and statistical web portal to facilitate a  horizontal price-fixing conspiracy by and between the Manufacturer Defendants.

235. FAMA knew or should have known that the Manufacturer Defendants sought out and presently use FAMA's data and statistical web portal for the express purpose of fixing, stabilizing, or increasing prices in the fire apparatus market at artificially high levels.

236. FAMA consistently modified and updated its data and statistical web portal based on the feedback and suggestions of its members, including the Manufacturer Defendants. These modifications and updates permitted Manufacturer Defendants to better further their price-fixing conspiracy.

237. As a result of FAMA's efforts, the Manufacturer Defendants were able to engage in a price-fixing conspiracy in violation of Section 1 of the Sherman Act.

238. Plaintiff and Class members are entitled to treble damages, attorneys' fees and costs, and an injunction against Defendants to end the ongoing violations alleged herein.

63

## XII. PRAYER FOR RELIEF

WHEREFORE, Plaintiff pray that the Court enter judgment on its behalf and on behalf of

the Class herein, adjudging and decreeing that:

A. This action may be maintained as a class action under Rules 23(a) and (b)(3) of the Federal Rules of Civil Procedure, appoint Plaintiff as Class Representative and its counsel of record as Lead Class Counsel, and direct that notice of this action, as provided by Rule 23(c)(2) of the Federal Rules of Civil Procedure, be given to the Class, once certified;

B. The acts of Defendants are illegal and unlawful, including the agreement, contract, combination or conspiracy, and acts done in furtherance thereof by Defendants and their co-conspirators be adjudged to have been a *per se* violation (or, alternatively, illegal under a quick look or rule of reason analysis) of Section 1 of the Sherman Act (15 U.S.C § 1);

C. Plaintiff and members of the Class recover damages sustained by them, as provided by the federal antitrust laws, and that a judgment in favor of Plaintiff and the Class be entered against Defendants in an amount to be trebled to the extent such trebling is permitted pursuant to such laws;

D. Plaintiff and members of the Class recover restitutionary relief to the extent such relief is afforded by any of the aforementioned laws;

E. Defendants, their affiliates, successors, transferees, assignees, and other officers, directors, agents, and employees thereof, and all other persons acting or claiming to act on their behalf, be permanently enjoined and restrained from in any manner continuing, maintaining, or renewing the conduct, contract, conspiracy, or combination alleged herein, or from entering into any other contract, conspiracy, or combination having a similar purpose of effect, and from adopting or following any practice, plan, program, or device having a similar purpose or effect;

F. Defendants, their affiliates, successors, transferees, assignees, and other officers, directors, agents, and employees thereof, and all other persons acting or claiming to act on their behalf, be permanently enjoined and restrained from in any manner continuing the exchange of competitively sensitive information between and among Defendants, causing anticompetitive effects without sufficient procompetitive justifications;

G. Plaintiff and members of the Class be awarded pre- and post-judgment interest, and that such interest be awarded at the highest legal rate from and after the date of service of the initial complaint;

H. Plaintiff and members of the Class recover their costs of this suit, including reasonable attorneys' fees and expenses, including costs of experts; and

I.      Plaintiff and members of the Class receive such other or further relief as may be just and proper.

**DEMAND FOR TRIAL BY JURY**

Pursuant to Federal Rule of Civil Procedure 38(b), Plaintiff hereby demands a trial by jury on all issues so triable.

Dated: December 2, 2025            **DYNAMIS LLP**

*/s/ Michael B. Homer*
Michael B. Homer
Brooke C. Watson
175 Federal Street, Suite 1200
Boston, MA 02110
(617) 693-9732
mhomer@dynamisllp.com

Joseph J. DePalma*
**LITE DEPALMA GREENBERG & AFANADOR, LLC**
570 Broad Street, Suite 1201
Newark, NJ 07102
(973) 623-3000
jdepalma@litedepalma.com

Laura K. Mummert*
Steven J. Greenfogel*
**LITE DEPALMA GREENBERG & AFANADOR, LLC**
1515 Market Street, Suite 1200
Philadelphia, PA 19102
(267) 314-7980
lmummert@litedepalma.com
sgreenfogel@litedepalma.com

*Attorneys for Plaintiff and the Putative Class*

* *Pro Hac Vice Forthcoming*

65